No. 47,629

ALAN S. QUERRY, *Appellant,* v. MONTGOMERY WARD AND COMPANY, INC., and NORTHERN ELECTRIC COMPANY, and J. A. PETERSON REALTY COMPANY, *Appellees.*

(535 P. 2d 928)

Opinion filed May 10, 1975.

*Clarence R. Wietharn,* of Overland Park, argued the cause and was on the brief for the appellant.

*R. Kent Sullivan,* of Payne & Jones, Chartered, of Olathe, argued the cause and was on the brief for the appellees Montgomery Ward and Company, Inc., and Northern Electric Company.

*James W. Humphrey, Jr.,* of Kansas City, Missouri, argued the cause, and *Kent T. Perry,* of Roeland Park, was with him on the brief for appellee J. A. Peterson Realty Company.

The opinion of the court was delivered by

KAUL, J.: This is an action to recover damages allegedy resulting from a fire caused by a defective electric blanket. Plaintiff-appellant (Alan S. Querry) instituted a products liability action against defendant Montgomery Ward and Company, Inc., and Northern Electric Company, retailer and manufacturer, respectively, of the electric blanket in question. Plaintiff's action against J. A. Peterson Realty Company is premised upon negligence in failing to provide fire extinguishers in the apartment building where plaintiff was a tenant on the date of the fire.

At the close of plaintiff's evidence, all defendants moved for a directed verdict. Defendants' motions were sustained and, after plaintiff's motion for a new trial was overruled, this appeal was perfected.

The questions presented are whether plaintiff has made out a case on (1) *res ipsa loquitur* and (2) breach of implied warranty against defendants Montgomery Ward and Northern Electric and (3) a case of negligence against defendant Peterson.

Plaintiff's evidence discloses that to the best of his recollection he purchased the blanket on December 20, 1972, at the retail store of Montgomery Ward in Topeka. The blanket was packaged in a sealed wrapper. Plaintiff took the blanket home, plugged it into a wall socket near his bed, and left it plugged in the socket until the time of the fire. In the interim plaintiff used the blanket six or seven times. Plaintiff's apartment was a studio one-room apartment located on the second floor with two other apartments. Plaintiff's testimony describing the interior of his apartment is narrated as follows:

". . . As you enter the front door, the kitchen area, bathroom, etc., are off to the right. Off to the left is the living room area. There was no separate bedroom and the plaintiff used a single bed for sleeping at night and for a couch during the day. The bed was flat up against the same wall as the entrance door. About one half way between the foot of the bed and the head of the bed was an electric outlet. On the night of the fire, there was plugged into that outlet a high intensity reading lamp and the electric blanket purchased from Montgomery Ward. . . ."

Plaintiff further testified that at no time when he used the blanket, either on the evening of the fire or on previous occasions, did he ever notice anything unusual about the blanket. Plaintiff was away from his apartment for a little over a week, during the Christmas season, after he purchased the blanket.

On January 4, 1973, the evening before the fire, plaintiff went to the Elks Club in Overland Park where he had drinks with friends. He returned to his apartment about 10:30 or 10:45 p. m. and immediately turned on the blanket. Plaintiff smoked a cigarette, which he believes he disposed of in the commode, and went to bed. He noticed the bed was warm, and he saw nothing unusual about the blanket's operation.

Plaintiff's testimony of ensuing events is narrated as follows:

". . . Plaintiff noted that the bed was warm and noticed nothing unusual about the blanket's operation. Plaintiff was lying in the bed mostly on his left side, though somewhat on his stomach, next to the wall, with his head facing away from the wall. The electric blanket cord ran from the wall socket in the center of the bed down to the blanket controls which were laid on the floor at the head of the bed. From the control box the cord extended back to the foot of the bed where it tied into the blanket.

"At approximately 1:30 a. m. on January 5, 1974, plaintiff was awakened rather abruptly when he felt his left leg burning. The electric cord had been between his leg and the wall and he assumed that it caused the burn. He jumped out of bed quickly and noticed while doing so, that there were all kinds of sparks that seemed to be emanating from around the head of the bed where he kept the controls for this electric blanket. Because of the positioning of the control unit on the floor in relationship to the head of the bed, plaintiff could not actually see the control unit. The edge of the covers towards the head of the bed were starting to smoulder. Plaintiff thought about a pail of water he kept in the furnace room but decided against using the water at that moment because he thought it was an electrical fire. He then ran out into the hall to get the fire extinguisher that had always previously been in its proper position, but found that it was not there. Plaintiff then returned to the apartment and observed that the left hand corner of the covers and the edge of the mattress and sheet were beginning to burn. Plaintiff then ran down to the first floor to get the fire extinguisher which was kept there. It was also missing, and in his haste and possibly due to wetness in the stairway, he fell part way down the stairs. By the time he came back upstairs the fire had spread to the pillow and had started along the wall by the bed itself. At this time plaintiff could do nothing but abandon the apartment."

As a result of the burn on his left leg, which awakened him, plaintiff sustained a scar which he described as an arc about four to five inches long. He had no actual knowledge, other than the circumstances, as to what caused the burn. In relation to his position on the bed and the wall socket, next to the bed, plaintiff testified the scar was approximately on a line directly out from the wall socket.

Concerning the possible use of the fire extinguisher, had it been in place, plaintiff testified that he knew that the use of water or the fire extinguisher, which was a soda acid type, on an electrical

fire was dangerous and might have caused him injury. Nevertheless, he claimed that if he had found the fire extinguisher in its intended place he could have controlled the fire by playing the extinguisher on the fringes and, thus, confining the fire damage to the bed and pillow.

After the fire, plaintiff returned to his apartment and removed the remains of the blanket control unit and the wires leading into it. Plaintiff also took the wall outlet and the wires leading into it.

Mary Eichelberger, an employee of the Fox Run Apartment Complex wherein plaintiff's apartment was located, was called and arrived at the scene about 1 a. m. She accompanied plaintiff to the hospital and had a conversation with him. She testified that plaintiff told her a spark from the wall socket by his bed hit him in the leg and awakened him.

Plaintiff was treated by a Dr. Sullivan who described the burn on plaintiff's left leg as being like a brand which could have been caused by an electric cord. However, the doctor stated he had no special training in examining burns and that his opinion as to possible causes was in the form of speculation.

Jim Donner, an employee of the company which serviced the fire extinguishers, testified that it was his customary practice to service soda acid fire extinguishers in his truck and not to remove them from apartment complexes. However, on the day before the fire, for the first time on orders of his boss, he had removed the fire extinguishers from the building and took them to his shop for servicing.

There was no direct evidence nor any expert testimony introduced by plaintiff concerning the specific cause of the fire.

We shall first consider the issues on appeal pertaining to defendants Montgomery Ward and Northern Electric.

Plaintiff consolidates his arguments as to his points one and two, both of which go to the applicability of the doctrine of *res ipsa loquitur* and breach of implied warranty. It seems that plaintiff takes the position that since he is relying upon the doctrine of *res ipsa loquitur* and an alleged breach of implied warranty he need only prove generally the circumstances of his loss, plead one or both of the two theories and the burden of proving causation will be waived or at least shifted to defendants. In other words, the plaintiff is asking the court to establish by inference that the blanket was the cause of the fire.

The trial court relied upon lack of evidence as to causation in sustaining the motions for directed verdict. As to *res ipsa loquitur* and implied warranty the court reasoned as follows:

"I'm taking up first the motions as they apply to Montgomery Ward and Northern Electric, and the reliance on the doctrine of res ipsa loquitur. I think it has to be established first what the cause was before the doctrine applies. And I think again to submit this to the jury would be to require the jury to speculate as to what caused the fire and then to apply the doctrine of res ipsa loquitur to that causation.

"And I don't think it can be said that it is an established fact that the fire was caused in the blanket.

"On the warranty feature, of course, we are talking about an implied warranty. There is no evidence of any express warranty. I'm unable to find any evidence upon which—any evidence which would support a finding by the jury that either of the defendants in question breached the implied warranty.

"There again you would have to premise the fire as having been caused by the blanket, and I can't find any evidence at all concerning a faulty construction of the blanket or failure to inspect and test. I think to submit that issue to the jury would be, in effect, to direct the jury to make the defendants insurers. And I don't believe that is the law of this state."

We believe the reasoning of the trial court accords with the decisions of this court and, under the evidence produced, its ruling is correct. There is no evidence of a defect, such as a short or defective insulation, in the blanket or in the control unit. Plaintiff recovered the remains of the blanket control unit wiring leading into it and the wall outlet and wiring. There is no showing whether examination by an expert might have revealed any evidence indicating causation. In other words, a conclusion that the blanket caused the fire rather than an overloaded or defective wall socket, a lighted cigarette, or any other cause must rest upon an assumption.

In many of our cases we have pointed out that the doctrine of *res ipsa loquitur* is a rule of evidence that permits an inference that the known act or instrument which produced the injury was a negligent act or a defective instrument, but it does not permit a further inference as to what act or instrument produced the injury. It cannot be assumed that absent negligence on someone's part the fire in plaintiff's apartment would not have occurred; and even if such an assumption could be made plaintiff still has the burden of showing that negligence could reasonably be attributed to defendants. Ordinarily, the doctrine applies only in those cases where the instrumentality or thing causing the injury is under the exclusive control of defendant or defendants at the time of the injury and the surrounding circumstances are such as to leave no reasonable con-

clusion to be drawn therefrom other than that the occurrence in question happened because of the negligence of defendants. We have held that inherent in the doctrine of *res ipsa loquitur* there are three essential elements—(1) The instrument causing the injury must be in the exclusive control of the defendants; (2) the happening must be of such a nature as ordinarily does not occur in the absence of negligence; and (3) the happening must not have been due to the fault or contributory negligence of the plaintiff. (*Bias v. Montgomery Elevator Co.*, 216 Kan. 341, 532 P. 2d 1053; *Vieyra v. Engineering Investment Co., Inc.*, 205 Kan. 775, 473 P. 2d 44; and *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P. 2d 82.) Viewing plaintiff's evidence in the most favorable light neither of the first two prerequisites is satisfied.

Likewise, plaintiff's evidence falls short of establishing a submissible case under the theory of breach of implied warranty. Fundamental to recovery under this theory is a showing that (1) plaintiff was injured by the product; (2) that injury was not due to his negligence; (3) that the product was defective; and (4) that the defect was present when the product left defendant's control. Mere proof of an accident or injury is not enough. (*Jacobson v. Ford Motor Co.*, 199 Kan. 64, 427 P. 2d 621; and Prosser [4th Ed.], Law of Torts, § 103, pp. 671-672.) In *Butterfield v. Pepsi-Cola Bottling Co.*, 210 Kan. 123, 499 P. 2d 539, an action involving injuries resulting from a bursting soda water bottle, we stated that although a claim for relief for breach of implied warranty may be proved by circumstantial evidence it does not follow that merely the fact that a bottle broke, while in the hands of a user, constitutes of itself a breach of implied warranty on the part of the bottle distributor. (See, also, *Tilley v. International Harvester Co.*, 208 Kan. 75, 490 P. 2d 392.) In *Jacobson v. Ford Motor Co.*, supra, wherein plaintiff based his action upon *res ipsa loquitur* and breach of express and implied warranties, we had this to say:

"Procedural difficulties aside, on any theory of liability a prerequisite to recovery against a manufacturer is that there be a defect in the product or instrumentality. Regardless of the ground of liability asserted, before a plaintiff can recover damages from a manufacturer, he must show the product was defective or harmful. This is essential. If the plaintiff cannot do so he has no cause of action on any theory. . . ." (p. 67.)

Accepting as true all of the facts which plaintiff's evidence tends to prove, he has failed to make out a submissible case on either *res ipsa loquitur* or breach of implied warranty.

We turn next to plaintiff's appeal from the directed verdict in favor of defendant Peterson. In sustaining Peterson's motion for a directed verdict, the trial court ruled:

"There, of course, is no evidence at all of any negligence independent of the doctrine of res ipsa loquitur and implied warranty so there is nothing before the court on that as to the defendant Peterson. There being no duty to maintain extinguishers in the premises I can't see any basis for permitting the jury to speculate as to whether there was any duty not to take them out for the purpose of servicing them. And I am assuming for this purpose that the defendant did permit them to be taken out, because there is evidence from which it can be inferred that the defendant knew that the extinguishers were being taken out for servicing.

"There being no duty to have them there, I cannot see how it could be found that taking them out for servicing was a breach of duty.

"It's unfortunate that the fire occurred on the very date that the extinguishers were taken out, but you have a further question there. I think the plaintiff's own evidence is that they wouldn't have done any good if they had been there."

Plaintiff concedes there is no common law duty imposed upon a landlord to provide fire extinguishers. (49 Am. Jur. 2d, Landlord and Tenant, § 891, p. 867.) It is plaintiff's argument that once Peterson provided fire extinguishers a duty to maintain them arose on the basis of an implied contract and that breach thereof renders Peterson liable in tort for personal injuries and damage. Plaintiff cites *Williams v. Davis,* 188 Kan. 385, 362 P. 2d 641. The liability of a landlord under a covenant to repair set out in *Williams* (American Law Institute Restatement of the Law of Torts, § 357) has since been recognized in *Richardson v. Weckworth,* 212 Kan. 84, 509 P. 2d 1113; and *Transport Insurance Co. v. Huston,* 207 Kan. 759, 486 P. 2d 1344. For several reasons it is unnecessary to determine here whether the covenant to repair rule may be stretched to encompass the theory of plaintiff.

In the first place Peterson strenuously argues plaintiff was not entitled to pursue the covenant to repair theory at trial or on appeal since it was neither alleged in his petition nor raised at pretrial. Plaintiff concedes that initially he predicated his action against Peterson on a statutory duty to provide fire extinguishers. Apparently, plaintiff did not discover that the statute upon which he relied (K. S. A. 36-118, repealed by Laws of 1972, Ch. 157, § 20) had been repealed and that the City of Shawnee had not adopted an ordinance concerning the matter as contemplated by regulations (K. A. R. 22-12-1 and 22-12-2) of the State Fire Marshal

promulgated pursuant to K. S. A. 1974 Supp. 31-133, a successor statute to K. S. A. 36-118, [repealed Laws of 1972]. The pretrial order sets out plaintiff's claim against Peterson in these words:

". . . [A]gainst defendant, J. A. Peterson Realty Company, on the theory of negligence for failure to provide fire extinguisher equipment."

Peterson points out that plaintiff made no effort to amend his petition or the pretrial order, but simply shifted his theory at trial to breach of an implied covenant to maintain fire extinguishers having once provided them. Peterson points out there is a real distinction between failure to provide and failure to maintain. Peterson cites *Stewart v. Bank*, 121 W. Va. 181, 2 S. E. 2d 274, 122 A. L. R. 161, wherein the Supreme Court of West Virginia set aside a plaintiff's verdict because plaintiff had pled defendant was guilty of negligence in failing to equip with fire extinguishers, but at trial, as did plaintiff in the case at bar, shifted to a theory of "legal duty to maintain" under which the verdict was obtained. On the point at issue the *Stewart* case is squarely in point. In reversing the judgment the Virginia court said:

". . . The duty to maintain such equipment is not required under common law or statute; but when voluntarily installed and held out to tenants as an element of safety, that duty rests upon an entirely different footing, and there is nothing in either the original or amended declaration on which a recovery can be based upon this theory. This is not a technical distinction. A defendant is entitled to know what he will be called upon to meet. . . ." (p. 189.)

The purpose of the pretrial order is to define and clarify the issues; it has the full force and effect of other orders of the court and controls the course of the trial unless subsequently modified. (*Beard v. Montgomery Ward & Co.*, 215 Kan. 343, 524 P. 2d 1159; *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 522 P. 2d 401; and *Tillotson v. Abbott*, 205 Kan. 706, 472 P. 2d 240.)

Moreover, even if plaintiff's pleading deficiency is overlooked, we are unable to find specific evidence to the effect that removing the extinguishers for a part of a day for servicing amounted to a breach of duty. Furthermore, under the evidence presented the portion of damages suffered by plaintiff, which might be attributed to the absence of the fire extinguishers would be purely a matter of speculation by the jury.

Plaintiff complains of the trial court's ruling excluding certain testimony of Jim Donner. However, since plaintiff failed to make an offer of proof in this regard, no reviewable issue is presented.

Under the provisions of K. S. A. 60-405, no judgment will be set aside by reason of the erroneous exclusion of evidence unless the proponent of the evidence makes known the substance thereof. (*Salem v. Salem,* 214 Kan. 828, 522 P. 2d 336; and *Davis v. Best Cabs, Inc.,* 203 Kan. 930, 457 P. 2d 516.)

In view of our disposition of the appeal other points raised by plaintiff need not be discussed.

The judgment is affirmed.

FONTRON and FROMME, JJ., not participating.