(624 P.2d 984)

No. 51,413

BOBBY LANE and WANDA LANE, his wife, *Appellants,* v. REDMAN MOBILE HOMES, INC., a subsidiary of Redman Industries, Inc.; REDMAN INDUSTRIES, INC.; and TOWN & COUNTRY MOBILE HOME SALES, *Appellees.*

Petition for review denied April 29, 1981.

Opinion filed March 6, 1981.

*Stanley E. Oyler,* of Ascough, Bausch, Eschmann, of Topeka, for the appellants.

*Steve R. Fabert* and *James P. Nordstrom,* of Fisher, Patterson, Sayler & Smith, of Topeka, for the appellees Redman Mobile Homes, Inc., and Redman Industries, Inc.

*John G. Atherton,* of Atherton, Hurt & Sanderson, of Emporia, for the appellee Town & Country Mobile Home Sales.

Before MEYER, P.J., ABBOTT and SWINEHART, JJ.

SWINEHART, J.: This is an appeal by the plaintiffs from a verdict directed in favor of all defendants in an action to recover damages resulting from a mobile home fire.

The sole issue is whether the trial court erred in directing a

verdict in favor of the defendants at the close of the plaintiffs' evidence.

On July 16, 1973, plaintiffs Bobby and Wanda Lane purchased a 1973 Bonanza mobile home manufactured by defendants Redman Mobile Homes, Inc., and Redman Industries, Inc., from defendant Helen Thomas, d/b/a Town & Country Mobile Home Sales. The plaintiffs had the mobile home moved to their property in Hartford, and resided there until it was destroyed by fire on the morning of December 11, 1975. A combination garbage disposal switch and plug outlet to the left of the kitchen sink was generally agreed to be the location of the electrical fire.

The mobile home had first been sent to defendant Town & Country, located in Emporia, by defendant Redman. Before delivering the home to plaintiffs, Town & Country tested its electrical system and found no problems. At his deposition, Robert Spatz (now deceased), who had been the general manager of Town & Country at the time of the purchase, stated that the home was delivered to the Lanes in the same condition in which Town & Country had received it from Redman. According to Redman officials and company manuals, Redman specifications for manufacturing such homes comply with applicable electrical codes.

The plaintiffs experienced a few difficulties with the mobile home during their occupancy. Most of the problems were of a nonelectrical nature. Mr. Lane testified that there had been one problem with a circuit breaker and Mrs. Lane noticed that once a spark flew out of the receptacle to the left of the kitchen sink, where the fire was believed to have started, when she attempted to plug in an appliance. She claimed she contacted Town & Country about the spark. She did not use the plug again, but used the garbage disposal regularly without incident. Neither of the plaintiffs had tampered with the switch in any way. Indeed, no electrical work had been performed in the home by the Lanes or any other persons except for installation of an outside electrical socket and hookups for antennas.

The Lanes were away from the home when the fire began. Mrs. Lane recalled that when she left the home that morning, no kitchen appliances were plugged into the suspect outlet. When plaintiffs entered the home after the fire was extinguished, they noticed that the area to the left of the kitchen sink had sustained the greatest amount of fire damage. This observation was cor-

roborated by a member of the Hartford Volunteer Fire Department.

The Lanes notified the defendant Town & Country of the fire shortly thereafter. However, they did not notify the defendants Redman.

The plaintiffs' expert was Ronald Wells of Hutchinson. Dr. Wells holds a Master's and a Ph.D. in metallurgy from the University of Denver and had investigated sixty to seventy fires. Wells investigated the fire at the Lanes' mobile home on December 16, 1975, and determined that the point of origin of the fire was associated with the switch and plug outlet to the left of the kitchen window and sink in the mobile home. The fire actually started in a jumble of wires behind the switch and plug outlet within the wall of the mobile home. Although some access might be gained to the area behind the faceplate of the receptacle switch by use of a screwdriver, Wells stated that the area of the fire was not generally accessible without removal of the wall paneling. Possible ignition sources of the fire included various things associated with electricity, *e.g.,* sparks, arcs between wires, possible grounding, possible shorts. His opinion was "that the fire originated in the wiring . . . inside the box [in] which the switch and plug were located." The primary defect associated with the particular switch and plug was a high concentration of wiring and junctions within the very small box behind the particular outlet in question, which was improperly fastened. If not secured properly, wires, so concentrated, can rub against each other, wearing through the insulation, thereby causing an arc between the wires. The arc, a source of a very high density of heat, can cause ignition of the surrounding material. The electrical wires leading to the receptacle in question were secured through a ceiling plate or stud about three feet away from the electrical receptacle. The next place where the wire was connected was at the receptacle itself. Wells reached this conclusion regarding the wire because the wall or stud where the wire was attached had not been destroyed and was susceptible to easy examination. Wells opined that such attachment is not a proper wiring technique due to the vibration problems associated with mobile homes. Even the Redman code called for cables from outlet boxes to be supported eight inches from the outlet boxes, a more stringent requirement than the twelve-inch standard in the applicable electrical code.

At the time of the investigation, Wells had also observed aluminum foil in the vicinity of the receptacle. Nevertheless, he did not ascribe any significance to it at his deposition because he thought it was part of the insulation of the mobile home. He later learned that Redman did not use foil in its insulation nor around the electrical units. Although foil may be properly used as insulation, here the evidence showed there was foil on or near the back of the receptacle which could have contributed to the fire.

On cross-examination, defendants sought to undermine the testimony of Wells by further emphasizing inconsistencies between his testimony during his deposition and at trial. For example, at his deposition Wells expressed no concern about a high concentration of wiring within the small box, nor did he refer to the possibility that aluminum foil could have been a source of ignition of the fire. Wells responded that since the time of his deposition, he had received information concerning Redman's construction requirements which included the fact that aluminum foil was not used in their insulation. He also did not believe it was conceivable that all the wiring could be put into a box of the size behind the receptacle. Since he was now aware that was the company intent, he had voiced his concern about the heavy concentration of wiring. In his deposition, Wells had also stated that a possible source of the fire was loose connections; he still believed these were a possible source of the fire, but not the most probable one. He also said that junction splices outside of the box were a possible cause of the fire, but again, he stated that he had no knowledge at the time of his deposition whether the connections were in or out of the box, nor did he know the composition or size of the box. Wells admitted that when he examined the wires the insulation had been burned off, so that he could not tell that day whether the wires had rubbed together to cause any holes.

On redirect, Wells testified that the foil appeared to be on the outside of the protective box. If the switch plate was removed, access could be gained to the inside of the box, but not the outside, because the wall paneling is usually cut to fit the shape of the receptacle. To get to the outside of the box, then, it would be necessary to get around through the wall, which only is done by electricians because the outside box itself is not accessible to a person who has merely removed the faceplate. Although the

receptacle unit can be taken out, the actual box is attached to the stud or other support.

At the close of the plaintiffs' case on June 19, 1979, all defendants moved for directed verdicts, which were sustained by the trial court. The plaintiffs moved for a new trial on June 28, 1979, which was overruled in a judgment form filed on August 23, 1979. On the same date, another judgment form was filed sustaining the directed verdicts rendered on June 19, 1979, in favor of all the defendants. The plaintiffs filed their notice of appeal on August 28, 1979.

The plaintiffs state two issues as follows:

"1. Whether the court was in error in holding that the evidence presented establishing the agency or instrumentality which caused the fire in question was insufficient to establish a submissible case to the jury.

"2. Whether the court erred in reaching a conclusion that the plaintiffs' mobile home was not in the same condition as it was at the time it left the hands of Town & Country and Redman."

Although these are the specific contentions regarding the propriety of the actions of the trial court, the more general issue may be stated as whether the trial court appropriately directed verdicts in favor of all the defendants.

In reviewing a motion for a directed verdict, the trial court is not to weigh the evidence, *Traylor v. Wachter,* 227 Kan. 221, 607 P.2d 1094 (1980), and is "required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. [Citations omitted.] The same basic rule governs appellate review of a motion for a directed verdict." *Simpson v. Davis,* 219 Kan. 584, 589, 549 P.2d 950 (1976).

In order to evaluate the propriety of the trial court's ruling sustaining all defendants' motions for directed verdicts, we must review the evidence adduced at trial. In addition, it may be helpful to bear in mind the burden cast upon plaintiffs to establish their claims against the defendants.

In this products liability action, the plaintiffs attempted to prove that the defendants were liable for damages sustained during the fire at their mobile home on the following theories: negligence, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, and

strict liability. All of these theories share the following proof requirements: (1) there must be a defective product; (2) the defect must have existed at the time it left the manufacturer's possession or control; and (3) the defect must have caused the injury sustained by plaintiffs. See *Brooks v. Dietz,* 218 Kan. 698, 545 P.2d 1104 (1976) (a strict liability action); *Evangelist v. Bellem Research Corporation,* 199 Kan. 638, 433 P.2d 380 (1967); *Jacobson v. Ford Motor Co.,* 199 Kan. 64, 427 P.2d 621 (1967) (involving breach of implied warranty actions).

All of the parties agree that these requirements must be satisfied but disagree as to whether plaintiffs sufficiently demonstrated a specific defect and even if they did, whether it caused the fire. "[P]roximate causation is generally deemed to require that the injury be reasonably foreseeable. . . . The proximate or legal cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. . . . The mere fact that a person suffered injury while using a product is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury." *Wilcheck v. Doonan Truck & Equipment, Inc.,* 220 Kan. 230, 235-236, 552 P.2d 938 (1976).

Even defendants concede that the fire started behind the outlet to the left of the sink and had an electrical origin. They contend, however, that plaintiffs presented no evidence of any defect that served as the source of the fire. Even if there was such a defect, they claim plaintiffs failed to establish that the defect existed at the time the mobile home left the control of the defendants. The trial court's reasoning comports with that of the defendants.

Plaintiffs, however, claim that they established a defect and that it was the cause of the fire in the eletrical system which eventually destroyed their mobile home. Specifically, they assert that their expert, Dr. Wells, determined the origin of the fire was in a jumble of wires behind the switch and plug receptacle in question, which had been improperly secured, because it was attached three feet away from the receptacle box in violation of Redman's own standards and the applicable electrical code. Wells based this conclusion upon an examination of that part of the wall into which the wires should have been fastened. It had

not been destroyed by the fire, thereby allowing him to observe that the attachment had not been made according to the relevant standards. Failure to properly secure the wires allowed them to rub together, causing the insulation to be worn away. Thus, the wires were subject to arcing, of which Wells had found some evidence. The presence of aluminum foil in the area could generate heat which was a contributing factor to the fire.

There was evidence that no one had ever gained access to the receptacle in question once the home left Redman's control. Plaintiffs testified that neither they nor others had ever tampered with the receptacle. Wells bolstered this testimony by pointing to the difficulty of getting to the box of wires. In order to reach the electrical wires and box involved, it would have been necessary to dismantle the wall or remove the electrical receptacle. As the plaintiffs and defendant Town & Country denied that they had ever done this, plaintiffs concluded that at the time of the fire the system had to be in the same condition as had existed when the mobile home left the hands of Redman. They contend this circumstantial evidence was sufficient to send the case to the jury.

"Circumstantial evidence, in a civil case, in order to support a verdict need not rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. It suffices that such evidence affords a basis for reasonable inference by the court or jury of the occurrence of the fact in issue, although some other inference equally reasonable might be drawn therefrom. [Citations omitted.]" *Arterburn v. St. Joseph Hospital & Rehabilitation Center,* 220 Kan. 57, 61, 551 P.2d 886 (1976).

Defendants point to disparities between the deposition of Dr. Wells and his courtroom testimony. They claim his opinions were purely speculative and that the plaintiffs failed to show that Redman was responsible for the alleged defective condition.

Although it cannot be disputed that Wells explained several ways in which the fire could have started, it also appears that any one of them could be attributed to a defect in the home resulting from acts or omissions on the part of the defendants, *e.g.,* failure to properly secure the wires and confining wires in a box smaller than necessary in violation of the Redman's own procedures and/or applicable codes.

The trial court agreed that the origin of the fire had been pinpointed, but did not believe causation had been demonstrated. Conceding that failure to properly fasten the wires in the home *may* have constituted a defect, the court felt that fact "doesn't

show that that had anything to do with the cause of this fire." Additionally, the judge found that vibration could have started the fraying of the insulation on the wires. However, as Mrs. Lane had testified that the home vibrated during storms while they lived there, the judge apparently believed that the vibration was an intervening cause of the fire, absolving defendants of any liability. However, if indeed the wires were not properly secured and as a result, vibration of the home during normal use caused the rubbing that eventually led to the fire, this does not seem to be a sufficient intervening cause to conclude that the defective electrical work did not cause the damage. Rather, it could provide more reason to hold defendants liable for failing to conform to the applicable standards which could have prevented such an unfortunate occurrence.

Based upon the testimony received at trial, plaintiffs urge that sufficient evidence was presented to prove that the defects associated with the wiring of the mobile home described by Dr. Wells caused the fire.

Defendant Town & Country asserts that the testimony of Wells was contradictory and failed to establish a definite cause of the fire. Redman concurs that the evidence introduced by the plaintiffs did not prove the cause of the fire. Redman cites *Querry v. Montgomery Ward & Co., Inc.,* 217 Kan. 104, 535 P.2d 928 (1975), in support of its contention that the cause of the fire could not be established by an inference. Although *Querry* stands for that proposition, it is also distinguishable from this case. In *Querry* the plaintiff attempted to prove that a fire resulted from a defective electric blanket. However, the plaintiff introduced no evidence of any defect in the blanket and no expert testimony concerning the specific cause of the fire.

All parties consider *Farmers Ins. Co. v. Smith,* 219 Kan. 680, 549 P.2d 1026 (1976), important to their positions. *Smith* involved an action against the manufacturer and seller to recover for loss of a mobile home and its contents in a fire. The plaintiffs were insurers of the homeowners. Their expert was not allowed to testify that the source of the fire "was a loose electrical connection at or near the electrical circuit breaker box," but was permitted to state that the fire began near the circuit breaker box and the hot water heater. On appeal the Supreme Court concluded that the trial court erroneously excluded the expert's opinion as to the

source of the fire, despite its circumstantial nature, because proximate cause may be shown by circumstantial evidence and expert testimony is proper to prove the cause of a fire if based upon adequate facts. "The real question in any case where the issue arises must always be whether there is substantial evidence, direct or circumstantial, fairly tending to prove the fact in issue." 219 Kan. at 689.

One issue in *Smith* was whether adequate evidentiary data existed to support an opinion by the expert that the source of the fire was a loose electrical connection at or near the circuit breaker box and the court decided there was. To reach that conclusion, the court relied upon the extensive investigative work done by the expert, his vast experience in probing other fires, and corroborating testimony that the fire was probably electrical.

The Supreme Court next considered whether the trial court erroneously sustained defendants' motions for directed verdicts at the close of the plaintiffs' case. To prove defendants were liable in this breach of warranty case, the plaintiffs had to show the defect existed when it left the possession or control of the defendants. While acknowledging that the plaintiffs raised a reasonable inference regarding the source of the fire (*i.e.*, a loose connection at or near the circuit breaker box), they failed to demonstrate sufficient factual data to support a reasonable inference that the surmised loose connection existed when the home left the possession or control of the defendants. There was no evidence to show that the loose connection did not occur during the time the plaintiffs' insured occupied the home. Unlike the instant case, however, in *Smith* an electrician hired by the occupants connected the home to the exterior electrical power supply and the area where the defect could have been located was *not* inaccessible to those using the home after sale and delivery.

Obviously, the parties dispute the significance of *Smith* as authority for their positions. The plaintiffs distinguish *Smith* and argue their expert opinion was based upon specific facts, including violations of Redman standards and applicable electrical code. Further, they contend they showed that the electrical box and wiring involved in this action was not accessible to the public or the occupants. Defendants believe the facts in this case square sufficiently with those in *Smith* to support the trial court's decision.

The defendants have also included citations from foreign jurisdictions to support their arguments on appeal. While generally accurate for the propositions cited, these cases are of minimal assistance to disposition of this appeal, especially in view of the state of the Kansas law in this area. Several, for example, were tried under a res ipsa loquitur theory, unlike the present action, see, *e.g.*, *Kerr v. Corning Glass Works*, 284 Minn. 115, 169 N.W.2d 587 (1969), or are otherwise so factually distinguishable with respect to the quantum and/or nature of the evidence presented to give them little persuasive value.

Further, the authority cited concerning the propriety of expert testimony is not very applicable because no issue has been raised upon this appeal challenging the admission or rejection of any particular expert testimony. The only real question is whether the admitted testimony was sufficient to support plaintiffs' causes of action.

We find that plaintiffs have demonstrated the existence of a defect in the mobile home electrical wiring, that the defect existed at the time it left the manufacturer's possession, and that the defect could have caused the injury alleged by the plaintiffs. We further find that the matter should have been submitted to the jury because the evidence was such that reasonable persons could arrive at different conclusions thereon.

Reversed and remanded for trial.