**James T. CLARK, Plaintiff,**

v.

**R.E.L. PRODUCTS, INC., Defendant.**

**No. 90–4121–R.**

United States District Court,
D. Kansas.

Aug. 14, 1991.

---

Paul D. Post, Topeka, Kan., for plaintiff.

Scott S. Bethune, David R. Buchanan, and Stacey L. Cook Rainey, Brown & James, P.C., Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

On July 25, 1991, the court directed a verdict in favor of the defendant at the close of all of the evidence. The purpose of this memorandum and order is to memorialize that ruling and elaborate upon the reasons for the court's decision.

Plaintiff claims that he suffered severe injuries when he fell from a wooden ladder designed, manufactured and sold by the defendant R.E.L. Products, Inc. Plaintiff contends that one of the ladder's rails split and caused the ladder to collapse. In the pretrial order, plaintiff contended that the ladder had the following design and manufacturing defects: (1) use of substandard materials; (2) use of side rails too narrow to support the weight of an adult male; (3) use of a staple through the side rail and into the rung; (4) failure to comply with the safety standards established by the American National Standards Institute (ANSI); and (5) failure to comply with the safety standards of the Occupational Safety and Health Administration (OSHA). Plaintiff further claimed that the defendant was negligent in one or more of the following particulars: (1) inspection of the ladder; (2) failure to follow ANSI standards in the design and manufacture of the ladder; (3) sale of a ladder with a latent defect; and (4) failure to properly warn concerning the use of the ladder. Prior to trial, defendant moved to preclude the plaintiff from making any reference to any claim based on decay of the wood used in the ladder. The court denied this motion, finding that the pretrial order was broad enough to cover such a claim.

The ladder involved in this case is known as a Stapleton Folding Extension Ladder. The ladder is thirteen feet in length and consists of three sections held together by steel hinges. The three sections can be folded so that the ladder can be easily carried or transported. When folded, the ladder measures 52 inches in length. The ladder is designed for and used primarily by insurance adjusters. The wood used for the rails is fir. The ladder contains a number of warnings, including the following, near the third rung from the top: "DANGER Do Not Stand On Or Above This Rung YOU CAN LOSE YOUR BALANCE." The ladder also contains the following directions: (1) "PLACE LADDER ON FIRM LEVEL SURFACE"; (2) "MAKE SURE ALL LOCKING DEVICES ARE SECURE"; (3) "KEEP BODY CENTERED BETWEEN SIDE RAILS AT ALL TIMES"; (4) "EXTEND LADDER AT LEAST 3 FEET ABOVE ROOF"; (5) "WEAR SLIP-RESISTANT SHOES"; and (6) "READ ADDITIONAL INSTRUCTIONS ON LADDER". A label attached to the side of one of the rails identifies the ladder as a Type I Industrial ladder. The defendant has advertised the ladder as "Built to OSHA specifications." The ladder in question was manufactured in 1988.

The parties raised an issue as to whether the ladder in question was a sectional ladder or a straight ladder under the ANSI standards. For the purpose of this opinion,

the court shall adopt the plaintiff's view and consider the ladder as a sectional ladder.

On the issue of liability, plaintiff presented his own testimony and the testimony of Denzell Ekey. Plaintiff's testimony revealed the following. On June 21, 1988, while working as an insurance adjuster for The Trinity Companies, he went to Alma, Kansas to inspect some houses that had recently been damaged by hail. In order to inspect the roof of a single story house, plaintiff unfolded his wooden ladder, which he kept in the trunk of his car, and leaned it against the house. He climbed the ladder to the third rung from top, he then put his left foot on the right side of the rung, and he began to step with his right foot onto the roof when the right rail of the ladder suddenly split. He fell approximately nine feet to the ground. He was momentarily dazed. As he regained his senses, he noticed that the ladder rail had split and that the ladder was still upright and resting against the side of the house at a slight angle. Plaintiff then folded up the ladder and left. Plaintiff was aware of the warnings on the ladder which indicated that the third rung from the top of the ladder should not be used and that the ladder should be placed at least three feet above the roof line. Plaintiff admits that he disregarded these warnings because he needed to gain access to the roof. Plaintiff had had this ladder for several months and had used it frequently prior to June 21, 1988. He was the only one who had used it. He testified that he kept the ladder locked in his trunk during the months that he had it. In rebuttal, plaintiff testified that he took a ladder identical to the ladder in question and dropped it on concrete and several pieces of wood, and the ladder did not break.

Denzell Ekey, a safety consultant, testified as an expert witness for plaintiff. Mr. Ekey is the president and founder of Safety Consulting, Inc. Safety Consulting, Inc. provides safety consulting, particularly concerning OSHA, and safety inspections for private and public entities. Mr. Ekey testified that he was familiar with the ANSI standards for wood ladders. He also indicated that OSHA used the ANSI standards for portable wood ladders. He stated that the ladder used by plaintiff on the date of the accident was a Type I industrial ladder. Under the ANSI requirements, Type I industrial ladders must have a duty rating of 250 pounds. He further stated that, under the ANSI definitions, the ladder was a "special purpose" ladder which closely resembled a "sectional" ladder. He rejected the suggestions that the ladder could be characterized as either a stepladder, extension ladder or single ladder. Mr. Ekey measured the rails of the ladder with a tape measure and found them to be $1\frac{1}{4}$ inches in thickness, $2\frac{9}{16}$ inches in depth, and 13 feet in length. He noted that ANSI required the side rails of sectional ladders that were 13 feet in length to have minimum dimensions of $1\frac{1}{8}$ inches in thickness and $2\frac{3}{4}$ inches in depth. He found that the ladder in question was not in compliance with the ANSI requirement for the depth of the side rail. He noted that ANSI contained an equation that allowed for some variations, but he determined that it was inapplicable. Mr. Ekey further stated that he had seen some advertisements from REL Products which indicated that the ladder in question had only been tested to a duty rating of 242 pounds, not the 250 pounds required by ANSI. Finally, Mr. Ekey responded as follows when he was asked how the fracture in the side rail of the ladder occurred:

A. Mr. Clark in his deposition and statements indicated that he had positioned the ladder in a normal position against the roof line that he was going to mount. Mr.—or Doctor Core had indicated that this was fir, a soft wood highly susceptible to decay.

The testimony of Doctor Burdette indicated that the nail through the rail and through the rung that can be noticed at each of the rungs on the bottom or lower side of the ladder in its normally-used position on the side, as indicated on the rails as "wrong side," was where the break occurred, where the nail went through the rail and rung, and that the ladder did not meet

the ANSI standard for rail dimensions, nor did it meet the ANSI standard for load testing, which the manufacturer advertised and labeled as a Type I ladder.

It was only tested to 242 pounds and 800 rather than 250 pounds and 1,000 as required by the ANSI standard. And when he mounted the ladder to mount the roof and started to step off, as he indicated, the rung broke out of the rail at the place where the nail goes through, and it's the break area where Doctor Core indicated that he found evidence of decay.

Upon subsequent questioning, Mr. Ekey acknowledged that the nails into the rungs were allowed by ANSI and were there to prevent the rungs from rotating.

On cross-examination, Mr. Ekey admitted that he was not a licensed engineer; he was not an expert in the properties of wood; and he was not an expert in calculating stresses or forces. He further indicated that the testing he had read about concerning the instant ladder was performed in 1973 and that he was unaware what ANSI required at that time and was unaware if any additional tests had been performed on the ladder since 1973. He acknowledged that he had no problem with the warnings on the ladder. He could not think of any additional warning that should have been on the ladder. He noted that ANSI does have certain provisions on the storage of wooden ladders, and those provisions require that wooden ladders should be stored so that they can obtain adequate ventilation. Mr. Ekey was further questioned concerning his opinion as to the cause of the accident in the following colloquy:

Q. And it's your opinion that this ladder broke from the weight of Mr. Clark's standing on that rail—on that rung?

A. Yes.

Q. And you relied on Doctor Burdette and Doctor Core to buttress that opinion. Is that correct?

A. Yes.

Q. Are you telling this jury that Doctor Burdette testified in his deposition that it was possible for this ladder to break under the circumstances described by Mr. Clark?

A. They didn't describe that method of breaking, they described factors that would make it possible.

Q. But isn't it true, sir, that their opinions expressed in their depositions were that the only way this type of fracture could have happened is that if the user, Mr. Clark, lost his balance and the ladder went down on the ground and was either hitting a solid object or he rode it down, but the impact had to come from the bottom. Isn't their testimony consistent with that?

A. They said that.

Q. And insofar as the wood condition, you would rely on what Doctor Core says, right?

A. I relied on his statement that it was a fir, a soft wood, susceptible to decay and that he found decay.

Q. Well, insofar as the condition of the wood and whatever characteristics it has, you would defer to Doctor Core because he's an expert on that, right?

A. That's his field.

Q. And like you told us before, you're not an engineer, you're not a civil engineer, you're not experienced or you don't have any expertise in calculating forces and stresses and things you get from physics. That's right, isn't it?

A. That's what I said.

Q. And in that regard you would rely on Doctor Burdette, wouldn't you, because he is an expert engineer?

A. That's his field.

The defendant presented the testimony of Robert Lensing, President of REL Products, Inc.; Dr. Harold Core, an expert witness in wood technology; and Dr. Edward Burdette, an expert witness in civil engineering. Mr. Lensing testified that he purchased the ladder manufacturing company which later became known as REL Products, Inc. in 1972. He indicated that the ladder in question is manufactured specifically for insurance adjusters. He noted that there were no load testing standards

in 1973, but that his company performed certain tests following a request by an insurance company. In 1982, ANSI adopted certain duty ratings. He indicated that following the adoption of these standards, all of the ladders he manufactured were tested and met the 250 pound duty rating. He also stated that samples of all the lumber he received for use in the construction of ladders were checked for size and moisture. He noted that the wood used in the ladder in question was "true fir."

On cross-examination, Mr. Lensing said he believed that the ladder in question was a special purpose ladder to be used as a straight ladder. He indicated that he believed that the ladder was in compliance with ANSI requirements. He admitted that his company was still using the advertisements that indicated that the ladders had been tested in 1973 for a duty rating of 240 pounds. He acknowledged that the ladders were intended to be transported in cars, but that they also should be hung in a dry place when not in use. He also stated that the ladders were treated to resist decay.

Dr. Harold Core is a retired professor of forestry from the University of Tennessee. He indicated that his examination of the ladder revealed that the fracture of the rail was caused by a force from underneath. He measured the ladder and found it to be 1.311 inches or approximately $1\frac{3}{8}$ inches in thickness and 2.630 inches or approximately $2\frac{5}{8}$ inches in depth. He noted that fir was an acceptable wood for this type of ladder. He said that he found some evidence of decay in the wood of the ladder. He further noted that fir, like all woods, was susceptible to decay. He found no substandard material in the ladder, no defect in the construction or design, and no violation of any ANSI or OSHA standards. He also noted that storing the ladder in the trunk of a car could be the cause of any decay found on the ladder. He further noted that the decay did not cause the break in the rail.

On cross-examination, Dr. Core admitted that hemlock was a better wood for use in ladders than fir. He further stated that he was unable to tell how long the decay had been there. He noted that the nail into the rung could only have an "infinitesimal" effect on the break.

Dr. Edwin G. Burdette is a professor of civil engineering at the University of Tennessee. He stated that he believed that the ladder in question was a straight ladder for ANSI purposes, but he believed that it complied with all ANSI requirements even if it were deemed a sectional ladder. He indicated that he had performed the alternative equation set forth in ANSI for dimensions of rails not in compliance with the standards and determined that the rails of the ladder in question were adequate. He opined that the ladder did not break as the result of the weight of the plaintiff on the third rung. Rather, he found that the break must have occurred when it hit something on the ground after it fell. He further found that neither the nail into the rung nor any decay would have caused the side rail to fracture. He further indicated that, even if the ladder did not meet the standard for a 250 pound duty rating and only met the standard for a 200 pound duty rating, this would not have caused the rail to break because the plaintiff was only 180 pounds at the time of the accident.

On cross-examination, Dr. Burdette acknowledged that he found some decay on the ladder at the time of his initial examination of the ladder. He stated that he believed that the ladder probably struck a piece of wood when it fell, and that caused the fracture.

At the close of plaintiff's case, the defendant moved for a directed verdict on all of plaintiff's claims except for the claim related to the alleged defect involving the narrowness of the rails. The court took the motion under advisement. At the close of all the evidence, defendant moved for a directed verdict on all of the plaintiff's claims. The court granted the defendant's motion.

The standards applicable to a motion for directed verdict are as follows. The standard to be applied is whether there is evidence upon which the jury could properly

find a verdict for the party against whom the motion is directed. *K–B Trucking Co. v. Riss International Corp.*, 763 F.2d 1148, 1163 (10th Cir.1985). In determining whether the evidence is sufficient, the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 498 (10th Cir.1984). Instead, the court must view the evidence most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence. *Id.*

■ In a products liability action, regardless of the theory of recovery—strict liability, negligence or implied warranty—a plaintiff must prove the following: (1) there must be a defective product; (2) the defect must have existed at the time it left the manufacturer's possession or control; and (3) the defect must have caused the injury sustained by the plaintiff. *Lane v. Redman Mobile Homes, Inc.*, 5 Kan. App.2d 729, 624 P.2d 984, 988 (1981). These elements may be proven by direct or circumstantial evidence. *Mays v. Ciba–Geigy Corp.*, 233 Kan. 38, 661 P.2d 348, 360 (1983). "For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." *Id.*

■ The defendant had argued that plaintiff's claims must fail for lack of proof of a defect because plaintiff had not established the existence of a defect in the ladder rail. The court found that the evidence, when viewed in the light most favorable to the plaintiff, was insufficient to establish that the ladder was defective or that any defect caused plaintiff's injuries. The court shall examine each of the defects claimed by the plaintiff and the evidence that related to it. The court has set out the testimony of plaintiff's expert witness, Mr. Ekey, in some detail because of its importance in determining whether plaintiff was able to establish that the ladder was defective or that any defect caused the plaintiff's injuries.

*Use of Substandard Materials*—The ladder rails were made of fir. There was no evidence that the use of fir for a ladder rail constituted a defect. Dr. Burdette suggested that hemlock might be a better wood, but none of the witnesses indicated that fir was an unacceptable wood for use as ladder rails. Fir was recognized by ANSI as an appropriate wood for ladder rails.

Plaintiff, through the testimony of Mr. Ekey and Dr. Core, pointed out that fir was subject to decay. However, Dr. Core testified that all woods are subject to decay. There was no evidence from any of the expert witnesses that decay caused or contributed to the fracture in the ladder rail. In addition, there was no evidence that the decay that was present on the ladder was there when it left the defendant's hands. Mr. Lensing testified that samples of all the wood received by his company were tested for moisture, and any wood with excessive moisture was not used. Dr. Core indicated that he had observed REL Products' employees and he was aware that they were familiar with the appearance of decay. Finally, Mr. Lensing indicated that all woods were treated with a lacquer solution to resist decay. In sum, the evidence was wholly lacking that any decay was present in the wood when it left the defendant's control or that any such decay caused the rail fracture.

*Narrowness of the Side Rails*—The principal thrust of Mr. Ekey's testimony was that the dimensions of the ladder rails were not in compliance with ANSI. A review of the ANSI standards reveals that Mr. Ekey failed to use the applicable ANSI provisions. Section 6 of the ANSI publication on wood portable ladders provides construction requirements for the ladders. Table 10 in that section provides the minimum rail dimensions for sectional ladders. The rail dimensions of the ladder in question must be $1\frac{1}{8}$ inches in thickness and $2\frac{3}{4}$ inches in depth. However, the ANSI standards provide alternative formulas in section 6.1.3.2(3) when both dimensions of the rail are different from the required sizes. The application of these formulas to the

ladder in question clearly indicates that the ladder was in compliance with ANSI. Plaintiff offered no evidence to contradict the finding that the ladder rails complied with the formulas of section 6.1.3.2(3). Rather, plaintiff contended that this section applied only to stepladders. A reading of this particular section and the surrounding sections demonstrates that plaintiff's view was clearly wrong. Section 6.1.3.2 indicates that it applies to "[a]djustments of sizes for wood parts of stepladders *and other ladder types covered in this standard.*" (Emphasis added). In addition, the next section, section 6.2, provides specific requirements for stepladders. In sum, the evidence was uncontroverted that the ladder rails complied with the ANSI requirements. Plaintiff's attempt to base a contention of defect on this theory must be rejected as a matter of law.

*Use of Staple Through the Side Rail and into the Rung*—The evidence showed that the fracture occurred at the place where the nail or staple went through the rail and into the rung. However, the evidence was wholly lacking that the nail into the rung caused or contributed to the fracture of the ladder or the rail. Mr. Ekey testified only that the break occurred at the place where the nail went into the rung. The other experts, Dr. Core and Dr. Burdette, testified that the nail in that area had nothing to do with the fracture. The testimony from both sides further revealed that the nail through the ladder rail into the rung fully complied with the ANSI requirements. In sum, there was no evidence that the use of a nail or staple through the ladder rail and into the rung was either a defect or that it caused or contributed to the fracture of the ladder rail.

*Failure to Follow ANSI Standards in the Manufacture of the Ladder*—The aforementioned discussion reveals that the ladder complied with all ANSI requirements. In addition to the claim based on the narrowness of the side rails, plaintiff also contended that the ladder had not been tested to meet the duty rating established by ANSI for Type 1 industrial ladders. Plaintiff pointed out that ANSI required Type 1 ladders to have a 250 pound duty, and the instant ladder had only been tested for a 240 pound duty rating. The evidence was uncontroverted that the Stapleton ladder had been tested for a 250 pound duty rating and had passed that test. Even if the evidence had demonstrated that the Stapleton ladder had only been tested up to 240 pounds, the evidence was still insufficient to demonstrate that this alleged defect caused the plaintiff's injury. There was no evidence that the failure to comply with the 250 pound duty rating required by ANSI would have caused the side rail to fracture when a 180 pound man climbed the ladder. In sum, there was no evidence that the ladder did not comply with ANSI or that any failure to comply with any ANSI requirement caused the plaintiff's injuries.

*Failure to Follow OSHA Standards in the Manufacture and Use of Ladder and in Warnings to Users*—Once again, plaintiff was unable to point to any OSHA requirement that was not met by the defendant in the manufacture of the ladder. Moreover, plaintiff failed to identify any warning that the defendant failed to provide on this ladder. Mr. Ekey, plaintiff's only expert, testified that the warnings were adequate and that he could not think of any other warnings that were needed.

Plaintiff had also contended that the defendant was negligent in a number of ways and that this negligence caused the injuries and damages he sustained. The defendant argued, in its motion for directed verdict, that there was no evidence of any negligence. Again, the court, after carefully considering the evidence and viewing it in the light most favorable to the plaintiff, found no evidence of any negligence by the defendant. Much of the prior discussion has application to the plaintiff's negligence claims, but we will briefly comment on those claims as well.

*Failure to Inspect the Ladder Prior to Sale*—There was no evidence presented that the defendant had not properly inspected the ladder prior to releasing it into the stream of commerce. The evidence showed adequate inspection procedures by the defendant.

*Failure to Follow ANSI Standards in the Design and Manufacture of the Ladder—*

**1188**

The court has discussed this particular contention in some detail in this order. To sum it up, the court found absolutely no instance of the defendant's failure to follow ANSI standards in the design and manufacture of the ladder.

*Selling a Ladder with a Latent Defect—* The exact nature of this contention was never made entirely clear to the court. The court found no evidence of any latent defect in the ladder.

*Failure to Properly Warn Concerning the Use of the Ladder—*Once again, there was a complete dearth of evidence on the issue of the inadequacy of the warnings on the ladder.

Finally, the plaintiff had contended that the defendant had breached an express warranty concerning the ladder. This claim was never specifically developed, but we assume that it related to the defendant's claim that the ladder was "[b]uilt to OSHA specifications." As we noted previously, the court found no evidence that the ladder failed to comply with either ANSI or OSHA. The court also failed to note any evidence of any other breach of warranty by the defendant.

In sum, the court found that the evidence, when viewed in the light most favorable to plaintiff, failed to support the submission of any claim to the jury. The evidence did establish that the plaintiff fell from the ladder, and that the ladder rail fractured. However, the evidence was insufficient to demonstrate that the ladder rail fractured as a result of any conduct by the defendant or that any conduct by the defendant caused the plaintiff's injuries and damages. The granting of the defendant's motion for directed verdict was the only course of action available to the court.

IT IS THEREFORE ORDERED that defendant's motion for directed verdict be hereby granted. Judgment shall be entered for the defendant and against the plaintiff.

IT IS SO ORDERED.