No. 47,975

KEITH WILCHECK, *Appellant,* v. DOONAN TRUCK & EQUIPMENT, INC., DOONAN TRUCK & EQUIPMENT OF WICHITA, INC., DIESEL EQUIPMENT CO., INC., and THE JACOBS MANUFACTURING COMPANY, *Appellees.*

(552 P. 2d 938)

Opinion filed July 23, 1976.

*Robert L. Howard,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Stephen T. Phelps,* of the same firm, *Daniel C. Bachmann* and *Jacob Graybill,* both of Bachman, Arnold & Graybill, of Wichita, were with him on the briefs for the appellant.

*Lee Turner,* of Turner and Hensley, Chartered, of Great Bend, argued the cause, and *Raymond L. Dahlberg,* of the same firm, was with him on the brief for the appellee, Doonan Truck & Equipment, Inc.

*William Tinker,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, argued the cause, and *William Tinker, Jr.,* of the same firm, was with him on the brief for the appellee, Doonan Truck & Equipment of Wichita, Inc.

*H. W. Fanning,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Harker E. Russell,* of the same firm, was with him on the brief for the appellee, Diesel Equipment Co., Inc.

*Donald R. Newkirk,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Richard I. Stephenson,* of the same firm, was with him on the brief for the appellee, Jacobs Manufacturing Company.

The opinion of the court was delivered by

SCHROEDER, J.: This action was initiated as a products liability case involving a Model 71 Jacobs Engine Brake, used on diesel trucks. On March 17, 1969, a tractor-trailer truck in which Keith Wilcheck, (plaintiff-appellant) was a relief driver and passenger overturned as it rounded the second part of an "S" curve on a Tennessee state highway near Hornbeck, Tennessee. The truck was being driven at the time by Ron Wilcheck, who was Keith's brother. Keith Wilcheck sued four parties: The manufacturer of the Model 71 Jacobs Engine Brake, Jacobs Manufacturing Company (hereafter Jacobs); the distributor of the brake who also repaired the brake, Diesel Equipment Co., Inc., (hereafter Diesel); the seller, Doonan Truck & Equipment, Inc., (hereafter Doonan's of Great Bend); and another truck dealer, Doonan Truck & Equipment of Wichita, Inc., (hereafter Doonan's of Wichita). The case went to a jury on theories of negligence and breach of warranties. It was alleged the Model 71 Jacobs Engine Brake was defective and caused the accident. The jury returned a verdict for Doonan's of Great Bend and Doonan's of Wichita, but was hung as to the other two defendants. The trial court then directed a verdict for the other two defendants, Jacobs and Diesel. Keith Wilcheck has duly perfected an appeal.

The trial of the lawsuit which required three weeks for the presentation of evidence was hotly contested. The record discloses on July 25, 1968, Ron Wilcheck purchased a new 1968 Peterbilt truck equipped with a Detroit Diesel Engine from Doonan's of Great Bend. Kenneth Doonan taught Ron how to drive. Ron took the truck to Tri-State Motor Transit Company in Joplin, Missouri, passed a driving test and began long haul driving under a lease with Tri-State, a commercial hauling enterprise. On Ron's first West Coast trip, his difficulties coming down Donner's pass convinced him he needed an engine compression brake to retard his truck and help eliminate getting his service brakes hot from overuse.

Ron had talked with other truckers and had seen a copy of an "elephant book" published by Jacobs describing their product. After having operated the truck approximately 30,000 miles, on September 7, 1968, Ron purchased a Model 71 Jacobs Engine Brake (also called a Jake brake) from Doonan's of Great Bend

who installed it on his truck and Ron continued his long haul business. At the time of the accident which gave rise to this lawsuit, the truck had been operated for approximately 140,000 to 150,000 miles and the engine brake had been in use for approximately 110,000 or 120,000 actual miles. The written warranty on the engine brake was limited to 100,000 miles, and Ron knew the warranty had expired.

Keith Wilcheck testified that when he first began to work with his brother as an assistant driver, his brother instructed him on the purpose and use of the auxiliary device as follows:

". . . He told me that it was a retarder such as coming up towards stop signs or something like this, it would slow the truck down. It would not stop the truck because this you had to do with service brakes, but it would aid in slowing down. It helped in slowing down for curves, descent, going down a grade or a mountain. It also worked as a retarder where you did not have to a keep a constant heavy pressure on the brakes. In other words, it saved the service brakes for other uses. He stated that it was a safety device because it would act as a brake, although not in the same sense as service brakes."

The product of Jacobs is sold by it to original equipment manufacturers for installation on new units and to distributors who in turn sell units to dealers for installation on trucks not originally equipped with an engine brake. Jacobs does not sell its engine brake directly to consumers or users.

A Jacobs Engine Brake is an electrically controlled, hydraulically operated engine attachment which may be used on diesel engines. It alters the exhaust valve operation on an engine not under power and acts as a brake on the diesel engine by causing the engine to work as an air compressor. This in turn permits the engine compression force to be applied to the power train and retard the vehicle normally powered by the diesel engine. Essentially, it works to hold back the diesel engine operated vehicle in a manner similar to a gasoline engine which holds back a moving automobile when the accelerator is retarded. The technical aspects of the operation of the brake are described by Jacobs as follows:

". . . Installed over the rocker arm assemblies of the diesel engine, the master piston within the engine brake housing picks motion from one part of the engine and through a hydraulic system within the brake, using entrapped engine lube oil, transfers this movement to a slave piston over the exhaust valves causing them to open at approximately top dead center on the compression stroke. This releases compressed cylinder air to the atmosphere. Under normal engine operating conditions, energy from the rear wheels is transmitted to the engine as compressed air in the cylinders. Without a

means of exhaust, the energy is returned to the drive wheels on the compression stroke. The engine brake provides a means of exhaust or dissipation of the energy in the cylinder air, preventing its return to the drive wheels via the piston. Continuous energy input to the engine results in controlled retardation of the vehicle by converting the engine to an air compressor or pump. . . .

"The Jacobs Engine Brake will allow a diesel engine to absorb enough energy to keep a 75,000 pound vehicle under complete control without the use of service brakes at 15 miles per hour on a 10 percent grade. By proper gear selection in relation to road speed, total vehicle control can be assured the operator without any change in driving habits, generally leaving service brakes free for emergencies or a final stop."

During the time the engine brake was in use for over 100,000 miles in the operation of the truck Ron Wilcheck testified it failed on at least seven different occasions, when it was necessary to have adjustments made, or parts replaced. Keith was aware of these failures. Some of this work was accomplished as ordinary warranty adjustments or parts replacement. While the complaints made to the service agencies at the time did not indicate it, the testimony of Ron and Keith at the trial, if believed, justify the inference that the Jacobs brake developed what came to be known by Jacobs as a "hang on" problem. The last repair work on the Jacobs brake was done on March 8, 1969. At that time the Jacobs brake worked properly until March 17, 1969, when the truck overturned on an "S" curve on a Tennessee highway. As a result of the accident, Keith was blinded and paralyzed from the waist down.

The appellant's evidence presents a complete history of the Jacobs brake and the problems which occurred with it. For a time Jacobs had ordered certain brakes disconnected because of the "hang on" problem. However, on February 7, 1969, Jacobs felt they had solved their problems and ordered a reactivation of all the Jacobs brake. At the time of the accident, the Jacobs brake on the Wilcheck truck had an outdated buffer switch and outdated solenoids.

The "hang on" problems which developed is necessary to an understanding of our decision in this case.

The Model 71 Jacobs Engine Brake was first placed in the hands of distributors for sale to the public in 1963. Other than problems common to such equipment which related to adjustment, service and owner experimentation, the product caused no difficulties and its design and service were entirely acceptable for several years.

In March 1968, however, new problems were reported from the field. They built up in September. By March 1969, there were 12,000 units in service and 500 reports of complaints had been received. The initial reports were confusing and it was difficult to locate the cause of the complaints. Various remedial measures were explored and tested. The field reports indicated that in some instances when a driver would touch the throttle to accelerate while the brake was engaged, there could be a slight or "momentary" delay before the engine brake would deactivate as intended. Don Cummings, manager of sales engineering for Jacobs, testified:

". . . The Detroit Diesel fuel system in the engine reacts very fast and within a few cycles, the brake and the engine would be fighting each other, really.

\* \* \* \* \*

". . . We never measured, but it was a short duration that the engine would be decelerating, and it would drop out of the speed range and click.

\* \* \* \* \*

". . . [M]aybe one or two seconds, if that long.

\* \* \* \* \*

". . . [F]ailing to shut off and staying on under power is one and the same and this was only momentary."

These were the characteristics that eventually became known as the "hang-on" problem.

It was determined that if the condition persisted and the unit was operated for a prolonged period of time, engine damage might occur because of high combustion temperatures and pressure being released during the momentarily delayed operation of the engine brake, and contact between valves and pistons would occur. This was the most serious result and might require some engine repair. Simultaneously, there developed occasional unreliability in the function of the electrical control system. Of the more than 12,000 units in operation, Jacobs was called on and did provide different degrees of repair on 50 engines before the "hang-on" problem was resolved and completely eliminated. Except for the property damage to 50 engines and the nuisance created by the momentary delay in operation, no damage, injury or accident was reported by any of the thousands of users of the product during the many years and millions of miles of use.

The problem was eventually solved by the development and use of a different solenoid and a different micro switch. It had been discovered that the Detroit Diesel Engine Company, which

manufactured some of the disel engines on which the Jacobs engine brake was used, had made some engine modifications (known as A-timing) which required closer tolerances in the engine brake controls to insure satisfactory performance on all engines.

In addition, it was discovered that truck operators were deviating from the diesel manufacturer's specifications for maximum engine RPM limits and this deviation was aggravating the situation.

The truck in question was equipped with an A-timed Detroit Diesel engine, and it had been modified at the direction of Ron Wilcheck, and over the protest of the dealer, to exceed the manufacturer's specifications for maximum RPMs.

Many issues involving instructions and trial error are urged on appeal. We have examined the appellant's claims in detail; nevertheless, when the evidence is viewed in the light most favorable to the appellant, we find no substantial evidence that any defect in the Jacobs brake, either in negligent repair, design or other theory advanced by the appellant, proximately caused the accident.

Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery. (63 Am. Jur. 2d, Products Liability, § 22, p. 31; *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P. 2d 82; 72 Supp. C. J. S., Products Liability, § 30, p. 46; 1 R. Hursh & H. Bailey, American Law of Products Liability 2d, § 1:28, p. 89, 91 and § 4:17, p. 691 [1974]; and Annot., 13 A. L. R. 3d 1057, § 7, p. 1084 [1967].)

In order to recover in a products liability action, the defective product must be the actual and proximate cause of the injury, and proximate causation is generally deemed to require that the injury be reasonably foreseeable. (72 Supp. C. J. S., Products Liability, § 30, p. 46.)

The proximate or legal cause of an injury is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. (*Campbell Sixty-Six Express, Inc. v. Adventure Line Mfg. Co. Inc.*, 209 Kan. 357, 496 P. 2d 1351; and *Elliott v. Chicago, Rock Island & Pac. Rld. Co.*, 203 Kan. 273, 454 P. 2d 124.)

The mere fact that a person suffered injury while using a product

is insufficient in itself to satisfy the requirement of proof that a defect in the product was a proximate cause of the injury. (1 R. Hursh & H. Bailey, American Law of Products Liability 2d, § 1:32, p. 105, 106 [1974]; and 63 Am. Jur. 2d, Products Liability, § 15, p. 24.) Our previous cases have indicated proof of injury while in the hands of a user does not establish a breach of implied warranty. (*Evangelist v. Bellern Research Corporation,* 199 Kan. 638, 433 P. 2d 380; and *Futterfield v. Pepsi-Cola Bottling Co.,* 210 Kan. 123, 499 P. 2d 539.)

Here the various bulletins, memos and letters of Jacobs relate only to showing a defect, not to establishing causation. Neither appellant's brief nor our research reveals a similar factual situation involving the Jacobs brake. Rather, the evidence indicates this is the first claim for personal injury or accident arising from the "hang on" problem of the Jacobs brake. (See, *McCormick on Evidence,* § 200, pp. 473, 477-478 [2nd Ed.]; *Frank R. Jelleff, Inc. v. Braden,* 233 F. 2d 671, 63 A. L. R. 2d 400 [D. C. Cir. 1956]; and *Savage v. Peterson Dist. Co.,* 379 Mich. 197, 150 N. W. 2d 804 [1967].)

The appellant's own version of the facts on causation are founded largely on the testimony of Ronald Wilcheck. Ron testified while driving at 45 m. p. h. on a Tennessee highway he approached the "S" curve sign. He observed a sign that had a posted speed limit of 40 m. p. h. *The Jacobs brake came on properly for the first part of the "S" curve and his speed dropped to approximately 40 m. p. h.* The truck continued for another 200 feet, and at this time *the Jacobs brake had slowed him down to approximately 37 to 38 m. p. h.* Because Ron could not see completely around the curve, he decided to slow down some more. Because the Jacobs brake had a greater retarding effect in a lower gear, Ron started to shift from the low side of seventh gear to the low side of sixth gear. When he pressed down on the accelerator to speed the engine RPM up *the Jacobs brake would not shut off* as he was coming across the neutral position from seventh gear to sixth gear. He stomped on the accelerator a couple of times to try and get the brake to shut off. He was unable to shut the Jacobs brake off and unable to shift into sixth gear. *Thus the truck was left in neutral in a free-wheeling position.* Ron testified that he was well into the curve and all he could see to do was just try to steer around it, but was unsuccessful. He testified he practically stood up trying to turn the steering wheel but the truck went into a side skid,

overturned on its side, and slid into a beer truck which was sitting in front of a bait shop beside the highway. The vital fact in Ron's testimony is his placing the speed of the truck before the malfunction of the Jacobs brake *at less than the posted speed.*

Summarized, the appellant's complaint is that because the Jacobs engine brake continued to function, when it should have shut off, the driver was not able to shift to a lower gear and reactivate the engine brake for further retarding effect. Because of this it is contended the truck overturned. This is the factual basis upon which the appellant seeks to prevail in this lawsuit. His sole theory on causation depends entirely on that version of the facts. The appellant's contention wholly ignores the *uncontradicted evidence in his case* that the speed of the truck before the malfunction was less than the posted speed and therefore no further speed reduction was required. It also ignores the testimony of the appellant's own expert witness, Dr. William Tonn, a consulting engineer from Texas. He gave the critical speed, the speed at which the tractor unit could negotiate the curve without going out of control, as 47 to 60 m. p. h.

The place where this accident happened in Tennessee was *on flat ground.* This was the testimony of Ron Wilcheck and there is no evidence to the contrary in the record. Therefore, with the truck in a free-wheeling condition and traveling at less than the posted speed for the "S" curve before the accident, the attempt by Ron Wilcheck to release the Jacobs brake by speeding up the motor could not accelerate the speed of the truck on the highway. The truck could not accelerate in speed by coasting on a highway in flat terrain.

The truck was equipped with service air brakes operated by a foot brake pedal and trailer air brakes operated by a lever on the steering column, which Ron Wilcheck admitted on cross-examination he could have touched in a mere fraction of a second. Neither the service brakes nor trailer brakes were ever used to slow the truck down on this curve. Ron Wilcheck further testified neither he nor Keith ever felt that the problems they were having with the Jacobs brake created any safety problems as far as operation of the truck was concerned; that the problems with the Jacobs brake were an inconvenience, *not a safety problem.*

The law does not require engine brakes on a truck to assist in retarding its speed, but it does require adequate service brakes and trailer brakes on combination vehicles, as here. The evidence

established the service brakes and the trailer brakes on the truck in question to be in good working condition, and adequate to have slowed the vehicle on the curve had they been applied.

On the foregoing evidence we find as a matter of law the appellant has not sustained the burden of proof to show that failure of the Jacobs brake proximately caused the accident and resultant injuries. (*Seely v. White Motor Co.,* 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P. 2d 145 [1965].)

Our disposition of the case does not require that the cause of the accident be established. There was considerable evidence by witnesses for the appellees that the truck was speeding in excess of the critical speed on the curve. The record discloses also that the truck in question was loaded with bombs at the Milan Arsenal in Tennessee for the trip in question. The appellant noticed that the braces supporting the load were looser than on previous trips, and commented on that fact to the carpenter who had installed them. Just before the truck turned over the appellant "felt an outward motion to the trailer going to the outside into the curve which I assumed would have been a shift from the left to the right of the trailer." This shift in the load the appellant believed contributed to the accident. Further cross-examination of the appellant relative to his deposition testimony, which he admitted to be true, discloses the following questions and his answers:

"Question: All right. And what were these conditions that you were going around the curve under. Answer: The truck free-wheeling and the load shift. Question: Keith, are you telling the court and jury that you cannot free-wheel around this corner at 37 miles per hour and make it without tipping over? Answer: You might be able to if the load didn't shift. Question: Did you feel this load shift before you started tipping? Answer: I think so."

The record disclosed Harvey Aluminum Sales, Inc., which had loaded the bombs, was originally sued by the appellant as a party defendant, but the action against it was dismissed prior to trial. In this connection the pretrial order recites:

"9. In the event of a verdict in favor of plaintiff against any defendant or defendants, such defendant or defendants shall be entitled to a credit upon judgment entered thereon by the amount paid by or on behalf of Harvey Aluminum Sales, Inc., to plaintiff or on plaintiff's behalf. However, no comment upon or reference to such matter or to the dismissal of Harvey Aluminum Sales, Inc. from the lawsuit, or to the fact that any sum has been paid by such former defendant, shall be made in the presence of the jury."

Under all of the facts and circumstances presented by the record in this case the appellant has failed to establish by sufficient evi-

dence to go to a jury that a defect in the Model 71 Jacobs Engine Brake installed on the truck unit here in question was a proximate cause of the accident resulting in the appellant's injuries.

The judgment of the lower court in favor of the four appellees herein is affirmed.