**Michael VOELKEL, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 92–4172–SAC.**

United States District Court, D. Kansas.

Jan. 11, 1994.

Henry O. Boaten, Topeka, KS, Henry O. Boaten, Junction City, KS, for Michael Voelkel.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, Rodney E. Loomer, Sherry A. Rozell, Gregory W. Aleshire, Turner, Reid, Duncan, Loomer & Patton, Springfield, MO, for General Motors Corp.

## MEMORANDUM AND ORDER

CROW, District Judge.

During the early morning hours of July 25, 1990, the plaintiff fell asleep at the wheel allowing his 1984 Pontiac Firebird to go off the road and collide with a tree. The accident occurred on a United States Military Reservation, Fort Riley, Kansas. The plaintiff alleges his personal injuries were enhanced when the seat belt that he was wearing failed to operate properly. The plaintiff brings this products liability action for personal injury upon causes of action in negligence, breach of express and implied warranty, strict liability, and negligence per se. The plaintiff further alleges express warranty claims under the Magnuson–Moss Warranty Act.

The defendant moves for summary judgment on several alternative grounds. The court shall grant such a motion if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.* 939 F.2d 887, 891 (10th Cir.1991). When the nonmoving party will have the burden of proof at trial, " 'Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted).

■ For purposes of this motion only, the following facts are uncontroverted [1]:

1. On July 25, 1990, the plaintiff fell asleep while driving his 1984 Pontiac Firebird. The car crossed over the opposite lane and struck a tree just off the roadway. The plaintiff was taken to Irwin Army Hospital and later to Stormont–Vail Hospital for treatment of his personal injuries. The accident occurred on the federal military reservation at Fort Riley, Kansas.

2. The defendant, General Motors Corporation ("GMC"), is a Delaware corporation registered and authorized to do business in Kansas. GMC designed and manufactured, in part, the 1984 Pontiac Firebird driven by the plaintiff on July 25, 1990.

3. The plaintiff's expert, James Yule, is not formally trained in medical causation, injury mechanism, biomechanics or occupant kinematics.

4. In May 1991, GMC sent out a recall notice for the seat belt buckle assemblies in its 1984–1990 Pontiac Firebirds. The notice said that in some models the red push button would fracture causing the buckle not to latch or not to release. GMC apparently issued the recall after determining that the plastic parts in the seat belt buckle assemblies did not contain an ultra-violet stabilizer.

5. James Yule first testified in his deposition that it was unlikely that the condition stated in the recall notice was causally relat-ed to the plaintiff's injuries. (Yule Depo. at 106). Later in his deposition, when asked if there was any problem or defect with the belt buckle which was causally related to the plaintiff's injuries, Yule answered "maybe." (Yule Depo. at 129). Yule said that the buckle did not latch with a clear metallic snap and that the latching mechanism just "didn't feel quite right." (Yule Depo. at 129). Yule further explained that the red push button had faded, that a little piece of the buckle assembly had broken off inside when he disassembled the buckle, and that something never identified also fell from the buckle during disassembly. (Yule Depo. at 130). Yule, however, opined that the piece found broken inside did not "functionally" affect things. (Yule Depo. at 130). Yule later added that he was not sure if the "something" which fell during disassembly even came from the buckle area. (Yule Depo. at 132). Yule then admitted that he could not opine to a reasonable degree of engineering certainty that the unidentified piece which fell caused or contributed to the plaintiff's injuries. (Yule Depo. at 131–134).

6. The plaintiff testified that prior to the accident he had experienced the belt buckle not properly latching or becoming unlatched sometime after he had thought it had latched.

7. James Yule testified that when he inspected the seat belt in February of 1993 the left shoulder belt was inoperative because the belt-slackening or adjusting device was assembled wrongly and had locked the shoulder belt in the fully extended position. (Yule Depo. at 89–90). James Yule could not say

---

1. The plaintiff's response to the defendant's statement of uncontroverted facts does not comply with the terms of D.Kan.Rule 206(c). Other than the conclusory statement that the defendant's facts at ¶¶ 11–14 are controverted, the plaintiff does not cite those portions of the record which controvert the defendant's paragraphs and does not cross-refer to a statement of controverted facts. Instead, the plaintiff offers his own statement of uncontroverted facts without moving for summary judgment. The local rules contemplate that the party opposing summary judgment set out a "concise statement of material facts" over which a genuine issue exists, in other words a statement of *controverted* fact, and this statement is to be supported by specific references to the record along with citations to the particular paragraphs of the movant's statement which are being controverted. D.Kan.Rule 206(c). In practice, different methods often have been used to controvert the movant's statement, and the courts have allowed them so long as they include specific citations to the record and directly refer to the movant's statement of facts by paragraph. By not meeting these basic requirements, the plaintiff runs the risk that "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D.Kan.Rule 206(c).

to a reasonable degree of engineering certainty whether the observed condition of excessive slack existed before the accident or only happened after the accident. (Yule Depo. 92–95).

8. The plaintiff's attorney's assistant, Randy Wheat, removed the seat belt assemblies from the plaintiff's car at the plaintiff's attorney's request two days after Yule's inspection in February of 1993. Yule wrote with an ink pen on the retractor and webbing of the driver's side seat belt assembly. Expert witnesses for the defendant, Jennifer Sevigny and Dr. Charles Moffat, inspected the vehicle only after Wheat had removed the seat belts.

## I. The Plaintiff's Legal Theories Were Not Viable When Fort Riley Became a Federal Enclave.

■ The defendant contends it is entitled to summary judgment on the plaintiff's warranty claims, negligent failure to warn claim, strict liability claims, negligence per se claim, and Magnuson–Moss warranty claim, because these legal theories were not recognized in Kansas, by statute or in common law, in 1872 when Fort Riley was ceded to the United States. The defendant relies on this general rule from *Orlovetz v. Day & Zimmerman, Inc.*, 18 Kan.App.2d 142, 145–46, 848 P.2d 463 (1993):

> With respect to federal enclaves situated within the boundaries of the State of Kansas, only federal law and such Kansas law (not in conflict with federal law) in effect at the time of the establishment of the federal enclave are applicable to the activities and operation within such federal enclaves. An exception to the above rule exists if subsequently enacted Kansas law is specifically adopted or made applicable by an act of Congress.

The plaintiff responds arguing that the exception applies here as Congress has enacted the following law:

> In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action

shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

16 U.S.C. § 457. After devoting almost one-fourth of its original memorandum to this argument, the defendant in reply offers only a single sentence generally denying that this federal statute makes current Kansas law applicable here.

Section 457 has been interpreted to apply "the current substantive law of the surrounding state in actions for death or personal injury occurring within a federal enclave." *Vasina v. Grumman Corp.*, 644 F.2d 112, 117–18 (2nd Cir.1981) (and cases cited therein). The apparent purpose of the statute is "to create a uniformity between the law to be applied in the federal enclave and that applied in the adjacent state." *Burgio v. McDonnell Douglas, Inc.*, 747 F.Supp. 865, 867 (E.D.N.Y.1990). The second sentence of § 457 makes current state law applicable to personal injury actions, while the first sentence accomplishes the same for wrongful death actions. *Id.* By its application here, § 457 incorporates current Kansas law governing personal injury actions and permits the plaintiff to maintain the different legal theories that have been pleaded.

Buried in the defendant's brief on this first issue are other arguments unrelated to choice of law. The defendant contends that the plaintiff cannot recover under the Magnuson–Moss Warranty Act ("MMWA") for personal injuries and cannot allege a violation of MMWA by simply incorporating a state law personal injury claim. The plaintiff says that he has alleged the elements for a claim under 15 U.S.C. § 2304(a)(1)—(4) on which personal injuries are recoverable.

■ Upon its filing, the pretrial order supplants the pleadings and controls what claims and theories are available for trial. At page six of the pretrial order, the plaintiff alleges that the defendant labelled its warranty as "full" thus obligating itself to correct defects

within a reasonable time. The plaintiff further alleges that the defendant did not have a procedure for meeting this obligation and failed here to correct the seat belt defects within a reasonable time. The only provisions of the MMWA cited by the plaintiff in the pretrial order, 15 U.S.C. § 2302(a)(4), (10) and (11), do not impose obligations on a warrantor but simply outline subjects for possible rulemaking by the Federal Trade Commission. Presumably, the plaintiff intended to cite 15 U.S.C. § 2304(a)(1) which requires the warrantor to provide a minimum remedy and 15 U.S.C. § 2304(a)(4) which requires the warrantor to permit the consumer to elect between a refund or replacement if the warrantor is unable to remedy the defect within a reasonable number of attempts.

The MMWA permits a consumer to bring a private cause of action against the warrantor for violating a substantive provision of the MMWA or for breaching a written or implied warranty. *Boelens v. Redman Homes, Inc.*, 748 F.2d 1058, 1062–63 (5th Cir.1984). The consumer may recover "damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). The availability of those remedies is circumscribed by another provision:

> Nothing in this chapter (other than sections 2308 and 2304(a)(2) and (4) of this title) shall (A) affect the liability of, or impose liability on, any person for personal injury, or (B) supersede any provision of State law regarding consequential damages for injury to the person or other injury.

15 U.S.C. § 2311(b)(2). This reference to § 2304(a)(4) in § 2311(b)(2) is "an error in draftsmanship," as Congress intended to make an exception for § 2304(a)(3) which requires the conspicuous display of disclaimers or limitations on consequential damages. *Gorman v. Saf–T–Mate, Inc.*, 513 F.Supp. 1028, 1035 (N.D.Ind.1981); *see also Boelens v. Redman Homes, Inc.*, 748 F.2d at 1065 n. 10; *Hughes v. Segal Enterprises, Inc.*, 627 F.Supp. 1231, 1237 (W.D.Ark.1986). The courts have held that an action for personal injury may be maintained only for substantive violations of §§ 2308 and 2304(a)(2) and (3). *Hughes*, 627 F.Supp. at 1237; *see Woodson v. McGeorge Camping Center, Inc.*, No. 91–1761, 1992 WL 225264, at *10, 1992 U.S.App. LEXIS 22747, at *32 (4th Cir.1992); *Boelens*, 748 F.2d at 1065–66; *Gorman*, 513 F.Supp. at 1036.

The plaintiff's claims, as set forth in the pretrial order, include substantive violations of the MMWA, but are limited to violations of 15 U.S.C. § 2304(a)(1) and (a)(4). A violation of 2304(a)(1) is not one of the exceptions stated in § 2311(b)(2). As for § 2304(a)(4), the court agrees with the precedent cited above that the reference to it in § 2311(b)(2) is a draftsmanship error and that an action for personal injury is not available when the warrantor fails to provide a refund or replacement remedy if unable to correct the defect after a reasonable number of attempts. Therefore, the defendant is entitled to summary judgment on the plaintiff's MMWA claim.[2]

---

2. Even assuming the plaintiff had brought a substantive violation claim under §§ 2308 or 2304(a)(2) or (3), this court favors the position taken by one commentator that § 2311 excludes all personal injury claims from the MMWA, including substantive violations. Barkley Clark and Christopher Smith, *The Law of Product Warranties* ¶ 20.08[1][b][ii] (1993 Supp.). This is for several reasons beginning with one of the apparent purposes of the MMWA—to fashion a remedy for small consumer claims because relief on them, as a practical matter, was not available in the courts. *Gorman*, 513 F.Supp. at 1033. Personal injury claims are not in the nature of small consumer claims and are not typically without an available judicial remedy. *Id.* Second, the most reasonable reading of § 2311(b)(2) is that personal injury claims are not cognizable and that it speaks only to what relief may become available when the exceptions effect the parties' warranty provisions. Specifically, the exceptions either preclude or void certain disclaimers, modifications, or limitations of written and implied warranties. 15 U.S.C. §§ 2308 and 2304(a)(2) and (3). Thus, if the purported disclaimers and limitations are ineffective by reason of the MMWA then the consumer may recover whatever state law allows, including extended damages on personal injury claims. Finally, the legislative history supports such a reading of § 2311(b)(2). The Senate Conference Report No. 93–1408, U.S.Code Cong. & Admin.News 1974, 7702, 7760 reads, in pertinent part:

> The conference substitute provides that nothing in title I "shall invalidate or restrict any right or remedy of any consumer under State law." It also provides that nothing in title I

Another of the defendant's contentions buried in this issue is whether Federal Motor Vehicle Safety Standard ("FMVSS") 207, 49 C.F.R. § 571.207, applies to any alleged defect so as to be relevant in the plaintiff's negligence per se claim. The plaintiff points to S4.2(c) of FMVSS 207 which addresses the force that a seat belt assembly must withstand. Contrary to what the defendant says, FMVSS 207 does appear to have something "to do" with seat belt assemblies.

## II. Summary Judgment Is Appropriate Because The Plaintiff Cannot Prove The Elements Necessary For Recovery On Any Of His Legal Theories.

In the pretrial order, the plaintiff organizes his contentions by first setting out the factual allegations for the specific defects and then concluding that the alleged defects are actionable under these different legal theories: strict liability, negligent failure to inspect and warn, negligence per se, breach of implied warranty of merchantability and breach of express warranty. The plaintiff alleges five specific defects with the seat belt. The seat belt buckle assembly did not properly latch because of a broken plastic component within the latch. This breakage of plastic components was due to the defendant's failure to treat the plastic components with an ultraviolet stabilizer. In May of 1991, the defendant sent a recall notice to owners regarding this condition. The notice informed owners about possible fractures to the red push buttons and offered to replace the push buttons and install protector shields. Second, the lap belt and shoulder belt are excessively long thus offering little protection from head injury in the event the seat belt retractors and lock-up devices fail. Third, the

comfort feature on the shoulder belt retractor complicates the retractor's operation making its failure more likely. Fourth, the comfort feature was improperly placed thus preventing the retraction of the shoulder belt from its fully extended position. Fifth, the shoulder belt retractor lacks retainers for the retractor spring board motor plastic housing. Without retainers, the housing can fall off or be wrongly placed both of which can interfere with retractor's function.

■ "Regardless of the theory upon which recovery is sought for injury in a products liability case, proof that a defect in the product caused the injury is a prerequisite to recovery." *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 235, 552 P.2d 938 (1976); *see, e.g., Cantrell v. R.D. Werner Co.*, 226 Kan. 681, 684, 602 P.2d 1326 (1979) (rule applies to express warranty claims); *Lane v. Redman Mobile Homes, Inc.*, 5 Kan.App.2d 729, Syl. ¶ 2, 624 P.2d 984, *rev. denied*, 229 Kan. 670 (1981) (rule applies to negligence, breach of implied warranties and strict liability claims). The cause of an injury is that "which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act." *Wilcheck*, 220 Kan. at 235, 552 P.2d 938. Proof of injury during use of the product, without more, is insufficient to establish that a defect in the product caused the injury. *Id.* at 235–36, 552 P.2d 938.

■ When advancing theories of negligence, breach of implied warranty of merchantability and strict liability in a products liability case, the plaintiff must prove three

"shall affect the liability of, or impose liability on, any person for personal injury, or supersede any provision of State law regarding consequential damages for injury to the person or other injury." *Thus a third party warrantor or other warrantor of a consumer product is not liable under title I of the bill for damages resulting from personal injury (either direct or consequential), but he could still be liable if State law imposed liability.*

The provisions relating to the effect of title I on State law should be considered in the context of two other provisions. Section 108 of the bill (relating to prohibition on disclaimers

on implied warranties) could be read to impose liability on persons to the extent it prohibits the disclaimer of implied warranties. The disclaimer on the imposition of liability contained in section 111(b)(2)(A) does not operate to negate the provisions of section 108 since the imposition of liability language relates to the consequences flowing from the existence of a warranty or service contract.

(emphasis added). In short, § 2311(b)(2) does not directly impose personal injury liability but may have the effect of creating the same under state law in the event that a warranty disclaimer or modification or limitation is struck down.

elements common to these theories: "(1) There must be a defective product; (2) the defect must have existed at the time the product left the manufacturer's possession or control; and (3) the defect must have caused the injury sustained by the plaintiffs." *Lane,* 5 Kan.App.2d at 729, 624 P.2d 984 Syl. ¶ 2; *See, e.g., Mays v. Ciba–Geigy Corp.,* 233 Kan. 38, 53, 661 P.2d 348 (1983) (A prima facie strict liability case includes proof that the product's condition was unreasonably dangerous and that the condition existed when it left the defendant's control); *Black .v. Don Schmid Motor, Inc.,* 232 Kan. 458, Syl. ¶ 5, 657 P.2d 517 (1983) (For an implied warranty claim, the buyer must show the good was defective and the defect existed at the time of sale).

In contrast, on an express warranty claim, the plaintiff is not required to prove that a specific defect exists in the product or that this defect existed when the product left the defendant's control. *Scheuler v. Aamco Transmissions, Inc.,* 1 Kan.App.2d 525, 529, 571 P.2d 48 (1977); *see Huebert v. Federal Pacific Electric., Inc.,* 208 Kan. 720, 724–25, 494 P.2d 1210 (1972). In showing that the product did not perform as expressly warranted, the plaintiff is not required to provide a technical explanation of how the product failed its warranty. *Cantrell,* 226 Kan. at 685, 602 P.2d 1326. As stated above, the express warranty claim still requires proof that the breach was the cause of the plaintiff's injuries. *Id.*

The elements to each of the plaintiff's different legal theories can be proved by direct or circumstantial evidence. *See Clark v. R.E.I., Products, Inc.,* 772 F.Supp. 1181, 1186 (D.Kan.1991), *rev'd on other grounds,* 972 F.2d 317 (10th Cir.1992). The Kansas Supreme Court has described this feature in the products liability setting, as follows:

> These elements may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on

mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility.

*Mays v. Ciba–Geigy Corp.,* 233 Kan. at 54, 661 P.2d 348. Circumstantial evidence can prove a proposition by a preponderance of the evidence even though the evidence does not rule out every other reasonable possibility. *Id.* at 53, 661 P.2d 348. "It is quite proper to use expert testimony to prove the cause of a fire [injury] provided the opinion of the expert is based upon adequate facts and is not based upon evidence which is too uncertain or speculative." *Farmers Ins. Co. v. Smith,* 219 Kan. 680, 690, 549 P.2d 1026 (1976) (citations omitted); *see also Mays,* 233 Kan. at 53, 661 P.2d 348. In sum, the question before the court is whether the plaintiff has come forth with sufficient evidence, drawing all reasonable inferences in his favor, as to justify a reasonable conclusion, couched in probability and not mere possibility, that the seat belts either were defective when they left the defendant's control or were in breach of an express warranty and that the defect or breach caused the plaintiff to sustain enhanced injuries. The court will address the plaintiff's different legal theories together with the exception of the express warranty claim. Because the plaintiff's burden on the express warranty claim is not to prove a specific defect, the court will discuss it separately and subsequently.

The defendant contends that the plaintiff is unable to show if any alleged defect in the seat buckle existed when the car left the defendant's possession or if that alleged defect caused the plaintiff's enhanced injuries. The defendant looks principally to the testimony of the plaintiff's own expert, James Yule. When asked if he believed that the plaintiff's seat belt buckle was affected by the condition for which the recall notice was issued, Yule said, "[p]robably not." (Yule Depo. at 105). Yule also opined that it was "unlikely" that the plaintiff's enhanced injuries were caused by any such condition. (Yule Depo. at 106). Facing such testimony from this own expert, the plaintiff seems unable to prove that the recall condition was a defect that existed in his seat belt buckle

and caused him to suffer enhanced injuries. The plaintiff still insists his claim should be submitted on his own testimony that he had occasional difficulty in latching the belt and on Yule's testimony about finding loose material in the buckle and observing something fall from the buckle during his investigation.

The plaintiff's testimony shows only his own difficulty with the buckle's operation. It cannot be logically stretched to the point of proving by itself that a product defect existed. His testimony is evidence that the buckle did not latch or came unlatched on occasion, but it is not evidence that the buckle was improperly manufactured or designed or was otherwise defective in any technical sense. It is the expert witness who typically explains the significance of the plaintiff's testimony in proving a defective product. In this case, however, Yule did not even consider or refer to the plaintiff's testimony in arriving at his expert opinion. Instead, Yule, performed tests on the buckle plugging it in one hundred different times and on each "plug-in" applied five separate sixty to seventy pound pulls against the buckle. (Yule Depo. at 201). The buckle never came unlatched during these tests. (Yule Depo. at 201).

■ As for Yule's observations that a small piece had broken off the push button assembly and that something fell from the buckle when it was being dissembled, this testimony is not enough for a reasonable jury to find for the plaintiff. First, Yule said, "I don't think that functionally it [the broken piece] affected things." Yule's testimony about something falling from the buckle is even worse for the plaintiff. When asked to commit to an opinion couched in a reasonable degree of engineering certainty, Yule answered:

A. "Well, it's a very iffy proposition." I don't know. I know that something fell. I

don't know that it came from here. I didn't see it come from here, but I know something fell, and I know that when I examined the floor for several feet around the spot, I didn't find anything I wouldn't expect to find in a garage, which would be dirt and sand and that kind of thing. I can't imagine it was dirt because dirt wouldn't—dirt would have just kind of floated out, so I imagine that it was very likely some kind of sand or a small, small stone, small. There were a number of things on the floor like that.

Q. (By Ms. Rozell) But you can't—

A. I can't say with a reasonable degree of engineering certainty that that's what caused the problem. I can say that if there was something in there, it might have caused a problem.

(Yule Depo. at 132). The court appreciates that Yule is testifying in part as a fact witness about the presence of something in the buckle and that this testimony need not be submitted in terms of a reasonable degree of engineering certainty. Still, Yule openly concedes that his own observations are too speculative for him to base an expert opinion as to defect or causation. If the plaintiff's own expert is unable to find a logical, factual basis on which to opine to a reasonable degree of probability that a specific defect existed or that the particular defect caused the plaintiff's injuries, then the jury is in no better position to reach a different conclusion, short of speculation.[3] The defendant is entitled to summary judgment on the strict liability, negligence and implied warranty claims concerning the seat belt buckle defects as alleged in the pretrial order.

■ Kansas law on express warranty claims does not demand the same level of proof on defect and causation. Rather than proving a specific defect to have existed when the product left the defendant's control,

---

3. Of course, this assumes the jury could make such a finding without the assistance of expert testimony. "Expert testimony is required with respect to a question an ordinary person is not equipped by common knowledge and skill to judge." *Bowman v. Doherty,* 235 Kan. 870, 879, 686 P.2d 112 (1984). "Expert testimony is necessary where normal experience and qualifications of lay persons serving as jurors does not

permit them to draw proper conclusions from the facts and circumstances of the case." *Pope v. Ransdell,* 251 Kan. 112, 120, 833 P.2d 965 (1992) (citation omitted). The plaintiff has not shown that the nature and existence of the alleged buckle defect are matters within the competency of laypersons for which expert testimony is unnecessary.

*Scheuler,* 1 Kan.App.2d at 529, 571 P.2d 48, the plaintiff must show that the product failed to perform as expressly warranted and that this breach of warranty caused the plaintiff's injury, *Cantrell,* 226 Kan. at 685, 602 P.2d 1326. In the pretrial order, the plaintiff claims that the owner's manual warrants the seat belts are "trouble-free, safe, of superior craftsmanship, built and manufactured with high quality materials and workmanship." (Dk. 83 at 5). Presumably, the plaintiff claims that such a warranty is breached when the seat belt buckle unexpectedly unlatches defeating the protective function of the seat belt. On such a claim, the plaintiff is not required to show the specific defect with the belt buckle which caused it to unlatch before or during the accident.[4] It is enough that the plaintiff show through direct or circumstantial evidence that he latched the seat belt buckle before the accident, that the buckle had not been abused or misused, that it unlatched just before or during the accident contrary to the warranty made by the defendant, and that he suffered enhanced injuries as a result of the unlatching. The

defendant also contends the plaintiff is unable to prove the last element of causation. The court will discuss this contention later.

■ Going now to the plaintiff's other allegations of defect, they turn on whether the retractor to the shoulder belt functioned properly during the accident. A little background helps to understand these alleged defects. The shoulder belt and seat belt in this car had separate retractors. The retractors lock the seat belt during a collision thereby restraining the passenger. The retractors also house the belt on a spool in a fully-retracted position when the belt is not in use. If a retractor does not engage and lock the seat belt during a collision, then the only protection offered by the seat belt is what restraint is available when the belt webbing is fully extended.

The plaintiff's expert, James Yule, testified that he found the shoulder belt was inoperative, did not retract, and was locked in the fully extended position because the comfort belt-slackening device had been assembled

---

4. In *Cantrell v. R.D. Werner Co.,* 226 Kan. 681, 602 P.2d 1326 (1979), the front rails of a ladder collapsed injuring the plaintiff. The ladder was warranted for loads up to 200 pounds and the plaintiff weighed 165 pounds. The plaintiff used the ladder in the proper manner, and there was no evidence that the ladder had been misused or abused. The ladder manufacturer appealed the district court's denial of its motion for directed verdict for insufficient evidence arguing the plaintiff had failed to prove a specific defect in the ladder. The Kansas Supreme Court affirmed quoting the following from *Huebert v. Federal Pacific Electric Co., Inc.,* 208 Kan. 720, 725, 494 P.2d 1210 (1972):

"A manufacturer may by express warranty assume responsibility in connection with its products which extends beyond liability for defects. All express warranties must be reasonably construed taking into consideration the nature of the product, the situation of the parties, and surrounding circumstances. However, defects in the product may be immaterial if the manufacturer warrants that a product will perform in a certain manner and the product fails to perform in that manner. Defects may be material in proving breach of an express warranty, but the approach to liability is the failure of the product to operate or perform in the manner warranted by the manufacturer."

In *Huebert,* the plaintiff recovered on an express warranty claim that the electric switch manufactured by the defendant falsely indicated that it

was "off" when it actually was "on." The defendant argued on appeal that the plaintiff had not shown the product was defective when it left the defendant's hands. The Kansas Supreme Court affirmed the denial of judgment as a matter of law for the manufacturer and quoted with approval the following from *Hansen v. Firestone Tire and Rubber Company,* 276 F.2d 254, 258 (6th Cir.1960):

" 'In an action of the present character, the burden of proof resting upon the plaintiff entails merely demonstration that the goods did not have the properties warranted. In the absence of controverting evidence adduced by the defendant, which convinces the jury that the goods were as warranted, plaintiff should prevail. (citation omitted). The plaintiff is not required to show the technical causation of the goods' failure to match their warranty. Nor is it necessary that the manufacturer's negligence be shown as the cause of such failure.' "

208 Kan. at 725, 494 P.2d 1210. Finally, in *Scheuler v. Aamco Transmissions, Inc.,* 1 Kan. App.2d 525, 571 P.2d 48 (1977), the plaintiffs sued the manufacturer of the transmission and franchisor alleging the express warranty was breached when the rebuilt transmission jumped into reverse. The manufacturer on appeal argued the lack of any evidence of a specific defect in the transmission. The Kansas Court of Appeals held that the plaintiffs did not have to prove a specific defect but only that the transmission did not perform as warranted. *Id.* at 529, 571 P.2d 48.

incorrectly. (Yule Depo. at 89–90). Yule observed that if the shoulder belt's retractor does not work then the shoulder belt offers little protection upon full extension because the manufactured length of the belt webbing is too long. (Yule Depo. at 90–91). Having first observed the seat belts almost three years after the accident, Yule acknowledged that he did not know when the shoulder belt first became fully extended and non-retractable. (Yule Depo. at 90, 92). In short, Yule admitted: "If I had knowledge of when the seat belt became defective, then I would have to consider that in forming a general opinion, but I don't know when the seat belt became defective." (Yule Depo. at 94). He further conceded to having no opinion to a reasonable degree of engineering certainty whether this condition of the shoulder belt existed before the accident or happened after the accident. (Yule Depo. at 95). Most importantly, Yule agreed that his opinion on these defects having a causal relationship to the enhanced injuries rested on an assumption that the belt was locked in the fully extended position immediately after the accident:

> Q. Let me try it this way. If the shoulder belt portion of the driver's seat was found fully retracted immediately after the accident, the situation that you've described where the belt was locked in a fully extracted position was not present at the time of the accident, you would agree with that, wouldn't you? [Objection omitted].
>
> A. You can always postulate that the thing worked perfectly during the accident. The man was belted in and everything worked perfectly and then later on somebody came and changed it, took off the cap and put the follower into the groove cam and put the follower in a place where it wouldn't operate any more. I find it a little difficult to think that someone would do that. I don't know why you would do it, but if that's what you are getting at, I guess that's my answer. It could be working perfectly. It could be found, if anybody even looked at, it could be found completely retracted and then later on, sure. I've already said that there's no way I can tell at this point how it was found or when this deficiency occurred....

> Q. .... But it seems to me that if the situation that you've described where the shoulder belt portion of the driver's belt is fully extracted and locked in that position, for that to be related to the accident in any way it has to be like that immediately after the accident, does it not?
>
> A. I would think yes. Now the question was it has to not be related to the accident if it's found retracted, then probably it isn't related to the accident because it was tampered with after the accident.

(Yule Depo. at 178–180). Yule did not base his opinion on any facts other than the condition of the belt when he inspected it almost three years after the accident.

The plaintiff is unable to show through his expert witness's testimony that the alleged defects with or affecting the shoulder belt retractor existed when the car left the defendant's control and that the alleged defect caused the plaintiff's enhanced injuries. The circumstantial evidence on this issue confutes Yule's assumption that the belt was fully extended after the accident. The plaintiff's accident was investigated by Joseph Briede, a military police traffic investigator stationed at Fort Riley, Kansas. When Briede arrived at the accident scene, Sgt. Price was already there administering first aid to the plaintiff who was still sitting in the driver's seat. Briede observed the seat belt "was fully retracted, kind of like behind the seat as they do in those '84 Pontiacs. When it's fully retracted, it's somewhat to the rear side of the seat. That's how that seat belt was." (Briede Depo. at 14–15). Briede further said that the seat belt was not fully extended with some of the webbing out. (Briede Depo. at 15). Briede testified that he did not unlatch the plaintiff's seat belt and that he was not aware of Sergeant Price unlatching the belt as the more common practice of "first responders," like Sergeant Price, was to cut the seat belt. (Briede Depo. at 22). Briede videotaped the car's condition at the accident scene. (Briede Depo. at 21). As observed by the defendant's expert, this videotape and other pictures taken of the car in April of 1982 show the shoulder belt was not in the same fully extended position as described by

Yule when he first observed it in February of 1993. (Sevigny Depo. at 42, 82–83).

In sum, the retractor's failure and the belt webbing's excessive length, in Yule's opinion, are defects causally related to the enhanced injuries, as a matter of reasonable probability, only if the shoulder belt was locked in the fully extended position immediately after the accident. There are no facts to support Yule's assumption about the fully extended position of the shoulder belt besides what he saw over thirty months after the accident. Uncontroverted evidence shows the shoulder belt was not in such a position when viewed, videotaped and photographed on occasions closer in time to the accident. Without evidence to the contrary, the plaintiff's theories succumb to the rule that product liability cases cannot be based on speculation, guess or conjecture. The result is particularly appropriate here because the alleged defects and the alleged causal relationships rest on an assumption proved wrong by overwhelming circumstantial evidence.

■ The court believes the defendant also is entitled to summary judgment on the plaintiff's express warranty claims concerning the retractor, comfort feature, and belt length. The plaintiff has not come forth with enough evidence for a reasonable jury to find that any breach of express warranty related to these features was a cause of the plaintiff's injuries. For the shoulder belt to have failed, it must have been engaged. At a minimum then, the plaintiff would need to show genuine issues of material fact that the seat belt assembly was worn and that it remained latched throughout the accident. Though the plaintiff has testified to the former, there is no evidence to support the latter. In the plaintiff's car, the shoulder belt webbing and the lap belt webbing are separate belts that are sewn together to a single latch plate. (Moffat Depo. at 59). Other than the belt buckle allegations, the plaintiff has not pointed to nor offered evidence of a defect in the lap belt. Consequently, assuming that the plaintiff was wearing his seat belt and that the belts remained latched during the accident and the shoulder belt failed, then the plaintiff still would have been partially restrained by the lap belt and there should be signs of this restraint. The plaintiff, however, has no evidence of the lap belt restraining him during the accident. There were no bruises or other injuries across the plaintiff's lower abdominal area indicating the lap belt was worn. (Ludvigson Affidavit, Sept. 8, 1993, ¶ 7, 9). His injuries are consistent with an unrestrained full body forward movement rather than a partially restrained rotational movement. (Sevigny Depo. at 85). Finally, there was no evidence of load on the lap belt typically found when it is used in an accident of this severity. (Moffat Depo. at 60–70). The plaintiff's expert, Yule, testified that he would not necessarily expect to see evidence of load on the seat belts in an accident of this type. (Yule Depo. at 115). The plaintiff, however, does not refute or dispute in any way the conclusions drawn from the medical evidence of his injuries or lack thereof. The plaintiff simply has no credible evidence that the alleged failure of the shoulder belt was a cause of the plaintiff's injuries. For this reason, the court grants summary judgment on all of the plaintiff's legal theories concerning the operation and housing of the shoulder belt retractor, the defective comfort feature, and the length of the webbing. The only claim now remaining is the plaintiff's express warranty claim on the belt buckle.

■ The defendant's final alternative argument is that the plaintiff is unable to prove that any of the alleged defects caused his enhanced injuries. Though the Kansas Supreme Court has avoided deciding if the second collision theory is available in Kansas, *Albertson v. Volkswagenwerk Aktiengesellschaft*, 230 Kan. 368, 370, 634 P.2d 1127 (1981), three different federal judges sitting in the District of Kansas have predicted that the Kansas Supreme Court eventually would adopt this theory. *Young v. Deere and Co., Inc.*, 818 F.Supp. 1420, 1422 (D.Kan.1992) (O'Connor, J.); *Stueve v. American Honda Motors Co.*, 457 F.Supp. 740, 758–59 (D.Kan. 1978); *see Pacific Employers Ins. v. P.B. Hoidale Co.*, 804 F.Supp. 137, 140 (D.Kan. 1992). Under such a theory, a manufacturer is liable for those injuries and damages caused by the defect over and above the injuries and damages that likely would have

resulted from just the accident absent the defect. *Harvey By Harvey v. General Motors Corp.*, 873 F.2d 1343, 1349 (10th Cir. 1989). The plaintiff's "duty to prove so-called enhanced damages is simply a part of the plaintiff's responsibility to prove proximate cause, that is, that the defendant in such a case is liable only for those damages which are within the orbit of risk created by him...." *Fox v. Ford Motor Co.*, 575 F.2d 774, 787 (10th Cir.1978). The Tenth Circuit in *Fox* rejected the manufacturer's plea to require the plaintiff to prove with unique specificity the enhanced injuries:

> We fail to see any difference between this type of case and the other case in which two parties, one passive, the other active, cooperate in the production of an injury. Each one's contribution in a causal sense must be established. Damages may be apportioned between the two causes if there are distinct harms or a reasonable basis for determining the causes of injury. Restatement of Torts, Second, § 433A.

575 F.2d at 787; *see also Harvey*, 873 F.2d at 1349. Expert testimony generally is necessary in order that jury not be left to speculate about the enhanced injuries. *Harvey*, 873 F.2d at 1350; *Curtis v. General Motors Corp.*, 649 F.2d 808, 812–13 (10th Cir.1981).

█ On this matter, the plaintiff offers only the medical testimony of Dr. Mark A. Ludvigson, the plaintiff's treating physician at the Irwin Army Community Hospital at Fort Riley, Kansas. The plaintiff submits from Dr. Ludvigson an affidavit in which he avers that some of the plaintiff's injuries "are consistent with improper or no restraint during an automobile accident." (Dk. 74, Ex. C). He further opined that four of the plaintiff's injuries "possibly could have been avoided had Mr. Voelkel been properly restrained." (Dk. 74, Ex. C). The defendant submits a more recent affidavit from Dr. Ludvigson which sheds more light on his opinion regarding the enhanced injuries:

> 9. That it is my opinion that it is more likely than not that Mr. Voelkel was not restrained by either a lap or shoulder belt during his motor vehicle accident.
>
> 10. That, as a result, I cannot provide expert testimony as to the extent of en-

hanced injuries Mr. Voelkel sustained attributable to his allegedly defective restraint system in his automobile because of my opinion that it is more likely than not he was not wearing a lap or shoulder belt during his accident.

(Dk. 80, Ex. C–1). For summary judgment purposes, the court must reasonably construe these two affidavits so as to favor the plaintiff.

Though the affidavits seem at odds, this does not appear to be an instance where the court is forced to take some measure to prevent conflicting testimony from creating a genuine issue of material fact. Instead, the court believes the affidavits can be construed harmoniously in favor of the plaintiff. This requires accepting a logical premise, that is, if the seat belt buckle never latches or unlatches upon impact, then the enhanced injuries would be the same or nearly the same as those suffered without any restraint. Obviously, Dr. Ludvigson is not willing to testify that the plaintiff suffered any enhanced injuries as a result of the alleged shoulder belt defect as there is no evidence that the lap belt was engaged. On the other hand, Dr. Ludvigson's second affidavit does not address the circumstance where the buckle fails to latch or unlatches before or during the accident. The court cannot tell from the affidavits whether Dr. Ludvigson understands the plaintiff's different defect theories, in particular, the breach of express warranty claim regarding the seat belt buckle. Drawing all reasonable inferences in favor of the plaintiff, Dr. Ludvigson apparently would testify consistent with his affidavit that the plaintiff suffered enhanced injuries if the seat buckle never latched or unlatched on impact. The court denies summary judgment to the defendant on this argument.

## II. The Defendant Is Entitled To Summary Judgment As A Discovery Sanction For Intentional Spoliation of Evidence.

█ After the plaintiff's expert inspected the seat belts in the plaintiff's car, the plaintiff's attorney's assistant removed the seat belts before the defendant's experts inspected the belts. The plaintiff's expert removed

the housing to the comfort feature outside the presence of the defendant's experts and without videotaping or photographing the process. The plaintiff's expert did record what he found by writing on the retractor itself, "Full–Out Wrong." The plaintiff's expert also wrote on the webbings from the subject seat belt. The defendant argues its defense of this case has been seriously prejudiced by the plaintiff's removal of seat belt system before their experts had an opportunity to inspect it. The defendant also argues that the writings on the evidence would be prejudicial if displayed to the jury.

Because the court has granted the defendant's motion for summary judgment on the plaintiff's claims regarding the retractor and the shoulder belt, the prejudice caused by the removal of the seat belt, at best, is minimal. The defendant does not argue that the removal or writings affected their experts' evaluation of the buckle's operation and condition. Nor does the defendant contend that crucial evidence on the buckle claim was destroyed when the seat belt was removed. The general condition of the seat belt after the accident is preserved to some extent by the Briede's 1990 videotape and by photographs taken by GMC back in April of 1992. Any potential for prejudice from the writings on the belt can be cured effectively through testimony and jury instructions. This is not a case where the sanction of dismissal or the exclusion of evidence is necessary or appropriate. The court denies the defendant's request for summary judgment on this ground.

IT IS THEREFORE ORDERED the defendant's motion for summary judgment (Dk. 67) is granted on all claims except for the plaintiff's claim for breach of express warranty regarding the failure of the seat belt buckle to latch or remain latched.